*In re* MARRIAGE OF MARY E. RAMSEY, n/k/a Mary E. Cornell, Petitioner-Appellee, and JOHN H. RAMSEY, Respondent-Appellant.

Fifth District   No. 5—01—0939

Opinion filed June 10, 2003.

Richard Kruger, of Kruger, Henry & Hunter, of Metropolis, for appellant.

Joseph J. Neely, of Neely Law Firm, of Metropolis, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

The Ramseys married in 1969 and divorced in 1989. Pursuant to John's request, the trial court reserved jurisdiction to divide his pension upon his retirement. Neither the parties nor the court contemplated then that John would be offered an early retirement incentive package. John retired in 2000 at the age of 55, taking advantage of early retirement incentives which required that both he and his employer make one-time monetary contributions to the Teachers' Retirement System of the State of Illinois (TRS). Shortly after John's retirement, Mary filed a motion seeking a qualified Illinois domestic relations order (QILDRO). The trial court granted Mary's motion. John appeals, arguing that the trial court erred by ordering him to pay to Mary a portion of his pension benefits attributable to his nonmarital monetary contributions. We reverse in part.

## I. BACKGROUND

John Ramsey and Mary Ramsey, now known as Mary Cornell,

were married in June 1969. Throughout the marriage, John was employed as a school teacher and participated in the TRS pension plan. The circuit court in Massac County entered an order dissolving the Ramseys' marriage in March 1989. Pursuant to that order, the court found the present value of John's pension to be $35,000 and awarded it to John, with an offsetting award of other marital property to Mary. On April 14, 1989, however, John filed a posttrial motion in which he requested that the court instead reserve jurisdiction to divide his pension upon his retirement. The court entered an order granting John's motion on November 9, 1989. The court ruled that the marital portion of the benefits actually paid was to be determined by multiplying the amount in "each benefit check issued" by a fraction with a numerator of 234 (the number of months John contributed to his retirement plan during the marriage) and a denominator of the total number of calendar months in which John contributed to the plan during his career. Mary would be entitled to half of this amount.

In 1998, the legislature created an early retirement incentive program for teachers. Without the early retirement incentives, the pension benefits of a teacher who chooses to retire prior to reaching age 60 or earning 34 years of credited service are reduced by 6% for each year the teacher's age at retirement is below age 60 (the early retirement discount). An early retirement option allows a teacher with at least 20 years of service to retire at age 55; however, to avoid the early retirement deduction, both the teacher and his employer must make a one-time contribution to TRS as follows: the teacher must contribute 7% of his highest annual salary multiplied by either the number of years until he reaches age 60 or the difference between the number of years of service he actually has and 35, whichever number is smaller, and the employer must contribute 20% of the teacher's highest salary multiplied by the number of years until he reaches age 60. See 40 ILCS 5/17—116.1(d) (West 1998).

A second early retirement incentive allows a teacher to augment his pension benefits by making a one-time contribution called a 2.2 upgrade. This payment allows the teacher to receive 2.2% of his average salary (defined as the average of his salary during his four highest-paid years) multiplied by his total years of service. See 40 ILCS 5/17—116(b)(3), 17—119.1 (West 1998). Without the 2.2 upgrade, the pension would be calculated as (1) 1.67% of his average salary multiplied by the first 10 years of service, (2) 1.9% multiplied by the next 10 years of service, (3) 2.1% multiplied by the third 10 years of service, and (4) 2.3% multiplied by the years of service in excess of 30. See 40 ILCS 5/17—116(b)(1) (West 1998).

John opted to take advantage of both the early retirement option

and the 2.2 upgrade. On July 5, 2000, he made a one-time lump-sum payment of $7,397.46 for the early retirement option and a payment of $6,390.60 for the 2.2 upgrade. His employer, the Century Unit No. 1 School District, made a one-time contribution of $35,226 for the early retirement plan on his behalf.

On June 29, 2000, John retired. He was 55 years old and had 32 years of credited service, including 31 years of actual service plus one year of unused sick leave and vacation pay. Because of the payments both he and his employer made to the fund, however, he received his full pension, without the early retirement discount, as augmented by the 2.2 upgrade. The total pension John receives is $1,980 per month.

On August 2, 2000, Mary filed a motion to modify the dissolution judgment by the entry of a QILDRO directing TRS to pay her portion of John's pension directly to her. On August 15, John filed a motion asking the court to determine the amount Mary was due.

On November 14, 2001, the trial court entered a QILDRO. The court found that John had voluntarily enhanced his pension knowing that Mary was entitled to a fixed percentage thereof and that the amounts attributable to John's nonmarital monetary contributions could not be readily severed from the rest of the pension. The court found that the proper denominator for the fraction in the formula was 384 (31 years, or 372 months, of actual service plus 1 year, or 12 months, of unused sick leave and vacation pay) and that, therefore, Mary was entitled to 30.47% of John's pension, or $603.31 per month. This appeal followed.

## II. ANALYSIS

■ Mary initially argues that this court lacks jurisdiction to hear John's appeal. We must, of course, dismiss an appeal if we find we lack jurisdiction. *Hwang v. Tyler*, 253 Ill. App. 3d 43, 45, 625 N.E.2d 243, 245 (1993). We find, however, that Mary's contention is without merit. She claims that John's notice of appeal does not ask for specific relief from the November 14, 2001, order because it states, "Defendant/ Appellant prays that the Order entered on November 28, 2000[,] [*sic*] be reversed ***." The notice of appeal also states that John "hereby appeals to [this court] from the Order entered on November 14, 2001, in [this] cause" and includes a copy of the November 14, 2001, order as an attachment. Mary cites three cases for the proposition that an appellate court lacks jurisdiction to consider issues not specified in the notice of appeal (*Atkinson v. Atkinson*, 87 Ill. 2d 174, 177-78, 429 N.E.2d 465, 466-67 (1981)) or appeals seeking relief from orders other than the order specified in the notice of appeal (*Ferguson v. Riverside Medical Center*, 111 Ill. 2d 436, 441, 490 N.E.2d 1252, 1254 (1985);

*Place v. Improvement Federal Savings & Loan Ass'n*, 24 Ill. 2d 245, 247, 181 N.E.2d 94, 95 (1962)). We think that only the most contrived reading of John's notice of appeal leads to the conclusion that the relief sought is from an order other than the November 14 order, as specified in the notice. We conclude that notice of appeal was effective and that we therefore have jurisdiction.

■ Because no factual determinations are at issue and the case presents only a question of law, we review the trial court's ruling *de novo*. *In re Marriage of Peters*, 326 Ill. App. 3d 364, 366, 760 N.E.2d 586, 588 (2001). We note that the parties agree this is the applicable standard of review.

John argues that he purchased the early retirement option and the 2.2 upgrade with his postdissolution earnings and that, therefore, Mary should not be entitled to any portion of his pension attributable to these early retirement incentives. He contends that the trial court should have (1) deducted the pension benefits attributable to the enhancements from the rest of the pension check prior to applying the formula to calculate Mary's share, (2) added 60 months to the denominator of the fraction in the formula, or (3) ordered Mary to pay her proportionate share of the lump-sum contributions required to give John the enhancements.

Mary, by contrast, argues that the trial court lacked jurisdiction to do anything but mechanically apply the formula set out in its November 1989 order. Noting that John's argument relies on the court's equitable power to prevent "unjust enrichment," Mary cites *Strukoff v. Strukoff*, 76 Ill. 2d 53, 389 N.E.2d 1170 (1979), in which our supreme court stated, " '[Courts in dissolution cases] may exercise their powers within the limits of the jurisdiction conferred by the statute[;] the jurisdiction depends upon the grant of the statute and not upon general equity powers.' " *Strukoff*, 76 Ill. 2d at 60, 389 N.E.2d at 1172-73, quoting *McFarlin v. McFarlin*, 384 Ill. 428, 431, 51 N.E.2d 520, 521 (1943). We believe that Mary cites this language out of context. In *Strukoff*, the trial court that had dissolved the Strukoffs' marriage held the hearing with respect to the grounds for the dissolution in the morning and the hearing on the ancillary issues the same afternoon. *Strukoff*, 76 Ill. 2d at 57, 389 N.E.2d at 1171. In so doing, the trial court violated section 403(e) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act), which at that time required a period of 48 hours between the two hearings, to allow the parties to settle their disputes amicably if possible. Ill. Rev. Stat. 1977, ch. 40, par. 403(e) (now see 750 ILCS 5/403(e) (West 2000)). The supreme court noted that a dissolution of marriage is an entirely statutory creation (*Strukoff*, 76 Ill. 2d at 60, 389 N.E.2d at 1172) and that,

therefore, the trial court lacked authority to enter an order not in compliance with the statutory provisions of the Dissolution Act (*Strukoff*, 76 Ill. 2d at 61-62, 389 N.E.2d at 1173).

We do not read *Strukoff* to prohibit trial courts from exercising equitable powers consistent with the Dissolution Act. Indeed, as John points out, this court has held that where no prior remedy exists, courts are empowered to create equitable remedies. *In re Marriage of Tollison*, 208 Ill. App. 3d 17, 20, 566 N.E.2d 852, 854 (1991) (a former husband who overpaid both maintenance and child support "cannot be denied relief simply because no procedural mechanism or current legal theory exists to undo the error"). Mary argues that *In re Marriage of Tollison* is distinguishable from the instant case because it involved child support, rather than a property division, and child support is something courts always have jurisdiction to modify. *In re Marriage of Tollison* involved both maintenance and child support, however (*In re Marriage of Tollison*, 208 Ill. App. 3d at 20, 566 N.E.2d at 854), and the maintenance involved was for a limited time period that expired prior to the court discovering the overpayment (*In re Marriage of Tollison*, 208 Ill. App. 3d at 18-19, 566 N.E.2d at 853). More importantly, this court did not base its holding on the trial court's continuing jurisdiction to determine child support issues but, rather, on its equitable powers. *In re Marriage of Tollison*, 208 Ill. App. 3d at 20, 566 N.E.2d at 854 ("The law is replete with legal theories ***, the underlying principle of which is that one person should not profit at the expense of another because of a wrong or a mistake").

■ In the case at bar, the trial court retained jurisdiction to divide the pension according to a previously determined proportion. We note that the order left open the denominator of the fraction, to be determined upon the receipt of the pension benefits, as, indeed, it had to do. When the time came to divide the pension, the court was presented with variables it could not possibly have foreseen in 1989 but which do impact the enforcement of the clear intent of the 1989 order. Although the order states that "each benefit check" is to be divided, it was contemplated that the pension itself would be divided. Indeed, the trial court lacked the authority to divide anything other than the pension the parties owned at the time of their dissolution even if some additional benefits are included in the checks. If the pension enhancements are a separate and distinct benefit that came into existence after the dissolution, they are not a part of the pension to be divided regardless of the fact that they are contained within one benefits check. See, *e.g.*, *Hannan v. Hannan*, 761 So. 2d 700, 706 (La. App. 2000) (finding enhancements to a pension to be an asset acquired

after the marriage ended and therefore not subject to division along with the rest of the pension). Thus, we turn to the substance of John's contention that the pension enhancements are not a marital asset.

■ In general, marital assets are to be divided at the time of the dissolution. *In re Marriage of Whiting*, 179 Ill. App. 3d 187, 191, 534 N.E.2d 468, 470 (1989). Pension plans are often difficult to value because the amount of benefits that will actually be received depends on future contingencies. The length of time the employee-spouse actually works, the salary he earns at the end of his career, and any changes to the terms of the pension plan necessarily impact the amount actually received. The pension involved in the case at bar provides an excellent example of the valuation problem. Although the trial court valued John's pension in 1989 at $35,000, it heard conflicting opinions of the parties' expert witnesses, whose valuations differed by 300%. It was precisely because of this valuation difficulty that the trial court granted John's motion seeking a reserved-jurisdiction division.

■ Because of this difficulty, Illinois courts have developed two different methods of dividing pensions. The first is the present-value method, whereby the court determines the present value of the pension plan, awards the entire pension to the employed party, and awards the other party enough other marital property to offset the pension award. *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 663, 397 N.E.2d 511, 519 (1979). Often this method is impractical either because of valuation difficulties or because the couple lacks sufficient readily divisible assets to provide an offsetting property award. *In re Marriage of Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519.

The second method is the reserved-jurisdiction method. In this method, the trial court reserves jurisdiction to divide the pension " 'if, as[,] and when' the pension becomes payable." *In re Marriage of Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519. The court determines the marital interest in the pension using a fraction, the numerator of which is the number of years or months that the employee-spouse contributed to the pension plan during the marriage and the denominator of which is the total number of years or months the employee-spouse contributes to the plan. *In re Marriage of Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519. Once the employee-spouse begins to receive pension benefits, the amount actually received is multiplied by this fraction to determine the marital interest in each payment, which is then divided according to the property division determined at the time of the dissolution (in this case, 50% to each party). *In re Marriage of Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519.

■ For the most part, Illinois courts have rejected the argument that nonpensioner spouses are only entitled to an amount determined by applying the proportionality formula to the pension their former spouses *would have* received had they retired upon dissolution rather than the pension they *actually* receive when they retire years after dissolution. The basis for this argument is that the pension received is ultimately determined by salary increases earned after the dissolution. See *In re Marriage of Wisniewski*, 286 Ill. App. 3d 236, 244, 675 N.E.2d 1362, 1368 (1997); *In re Marriage of Alshouse*, 255 Ill. App. 3d 960, 963, 627 N.E.2d 731, 733 (1994); *In re Marriage of Whiting*, 179 Ill. App. 3d at 191, 534 N.E.2d at 470. We hasten to point out that John does not raise this argument. A review of the policy behind rejecting it, however, is helpful to understanding the character of the enhanced pension benefits here at issue.

By postponing the division of the pension until it is received, both parties share the risk that the employee-spouse will change jobs or die before retiring, which may reduce the pension substantially or forfeit the benefits completely. See *In re Marriage of Hunt*, 78 Ill. App. 3d at 664, 397 N.E.2d at 519. Given that the parties necessarily share these inherent risks when the division of the pension is postponed, it is only equitable that they share in the benefits of unforseen increases in the value of the pension as well. See *In re Marriage of Wisniewski*, 286 Ill. App. 3d at 246, 675 N.E.2d at 1370. Moreover, by postponing the receipt of the funds, the nonemployee-spouse forgoes the benefits of having the asset at the time of the dissolution. See *In re Marriage of Wisniewski*, 286 Ill. App. 3d at 246, 675 N.E.2d at 1370 ("the salary in 1981 may be roughly equivalent to the salary in 1994" "because the cost of living has increased"). Further, the higher-paid later years in an employee's career would not be possible without the lower-paid earlier years during the marriage. See *In re Marriage of Wisniewski*, 286 Ill. App. 3d at 245, 675 N.E.2d at 1369; see also *Berrington v. Berrington*, 534 Pa. 393, 408-09, 633 A.2d 589, 597 (1993) (Cappy, J., dissenting) ("[T]he time and energy that participant spouse devoted to the job during the marriage and the work skills developed during that period ***, rather than increased efforts or work skills developed after marriage, are the most significant factors explaining increased post[ ] marital earnings ***").

John contends that this court departed from these holdings in *In re Marriage of Blackston*, 258 Ill. App. 3d 401, 630 N.E.2d 541 (1994). *In re Marriage of Blackston* involved a direct appeal from a dissolution order that included a reservation of jurisdiction to divide the former husband's pension plan when he began drawing retirement benefits. *In re Marriage of Blackston*, 258 Ill. App. 3d at 404, 630 N.E.2d at 544.

This court merely held that the trial court had been presented with insufficient evidence from which it could determine that such a method of division was the most appropriate one. *In re Marriage of Blackston*, 258 Ill. App. 3d at 407-08, 630 N.E.2d at 546. Although the reserved-jurisdiction method is not the only acceptable way to value a pension, when it is used, the amount divided is the amount actually received. *Helber v. Helber*, 180 Ill. App. 3d 507, 511, 536 N.E.2d 110, 112-13 (1989).

One reason that the division of benefits actually received based on the proportionality rule is equitable is that the pension benefits generally grow larger the longer the spouse covered by the pension continues to work. However, as they do, the portion of the pension to which the former spouse is entitled diminishes. Therefore, the former spouse is entitled to "a smaller percentage of a bigger pie." *Stouffer v. Stouffer*, 10 Haw. App. 267, 278, 867 P.2d 226, 231 (1994). Early retirement incentives turn this assumption on its head. Although such incentives can vary dramatically in how they are accomplished, they essentially allow employees to retire with full pension benefits without working all of the years originally anticipated. For an early retiree like John, whose pension plan is subject to division under a reservation of jurisdiction, the pie becomes larger without the piece to which the former spouse is entitled becoming smaller.

Surprisingly few cases address the issue of early retirement incentives. Because we are aware of no Illinois cases directly on point, we must look to the decisions of other jurisdictions for guidance, some of which follow community property law rather than marital property law. Therefore, we first note that the two forms of marital law have evolved similar enough rules for the distribution of property to allow a comparison. *In re Marriage of Hunt*, 78 Ill. App. 3d at 659, 397 N.E.2d at 516 (noting the similarities between Illinois's statutory definition of marital property and the concept of community property); see also *In re Marriage of Lehman*, 18 Cal. 4th 169, 184 n.7, 955 P.2d 451, 459 n.7, 74 Cal. Rptr. 2d 825, 833 n.7 (1998).

The Court of Appeals of New York considered the issue of early retirement incentives in *Olivo v. Olivo*, 82 N.Y.2d 202, 624 N.E.2d 151, 604 N.Y.S.2d 23 (1993), a consolidated appeal. There, two previously divorced Kodak employees opted to take advantage of an early retirement incentive plan that included, among other things, an enhanced pension benefit allowing the employees to receive 100% of the retirement benefits for which they would be eligible were they not to retire early. (The plan included additional incentives not analogous to those offered to John in the instant case.) The incentives were only available to employees whose years of service with the company added to their

ages totaled at least 75 years, and the incentives were financed entirely by Kodak. *Olivo*, 82 N.Y.2d at 205, 624 N.E.2d at 153, 604 N.Y.S.2d at 25. Like the early retirement incentives offered to John, the incentives offered to the retirees in *Olivo* did not exist when their marriages were dissolved. *Olivo*, 82 N.Y.2d at 208, 624 N.E.2d at 154, 604 N.Y.S.2d at 26.

In holding that the former wives were entitled to the previously determined fractional shares of the entire pensions, including the enhancements, the court explained: "By its very nature, a pension right jointly owned as marital property is subject to modification by future actions of the employee. Should the employed spouse retire early, both parties receive a smaller benefit than they would have otherwise." *Olivo*, 82 N.Y.2d at 209, 624 N.E.2d at 155, 604 N.Y.S.2d at 27. Likewise, the court explained, "[B]oth parties' rights are generally subject to changes in the terms of a retirement plan, as well as to circumstances largely beyond their control, such as the salary level finally achieved by the employee and used to calculate the pension benefit." *Olivo*, 82 N.Y.2d at 209-10, 624 N.E.2d at 155, 604 N.Y.S.2d at 27. Thus, the court found that the pension-enhancement component of the early retirement incentive package was "a modification of an asset[,] not the creation of a new one." *Olivo*, 82 N.Y.2d at 210, 624 N.E.2d at 155, 604 N.Y.S.2d at 27. Because the enhancement was merely a change in the terms of the Kodak retirement plan, it was subject to division with the rest of the pension as previously determined.

A Hawaii appellate court followed *Olivo* in *Stouffer*, 10 Haw. App. at 280, 867 P.2d at 232. There, the parties' agreement to divide the husband's retirement benefits in agreed-upon proportions when received was incorporated into their divorce decree. *Stouffer*, 10 Haw. App. at 270, 867 P.2d at 227. Subsequently, the husband's employer, Baxter Healthcare Corp., offered him an early retirement incentive package. *Stouffer*, 10 Haw. App. at 271, 867 P.2d at 228. The husband opted to accept the incentive offer and retire early. *Stouffer*, 10 Haw. App. at 272, 867 P.2d at 229. The early retirement incentive program enhanced his pension by adding five years to both his age and his credited years of service. *Stouffer*, 10 Haw. App. at 271, 867 P.2d at 228. The five years added to his age reduced the amount by which his pension was reduced due to an early retirement discount, and the five years added to his credited service increased the dollar amount of the pension because it was calculated based on years of service. *Stouffer*, 10 Haw. App. at 271, 867 P.2d at 228-29.

The court noted that Hawaii law calls for pension benefits to be divided upon receipt according to the same formula that Illinois law

uses, a formula which "recognizes that each year of employment played an integral part in acquiring the right to the retirement payments." *Stouffer*, 10 Haw. App. at 277, 867 P.2d at 231. The court held that the fact that Mr. Stouffer's retirement benefits were enhanced by an early retirement incentive did not change this method of division. *Stouffer*, 10 Haw. App. at 278, 867 P.2d at 231.

Likewise, the California Supreme Court followed *Olivo* in *In re Marriage of Lehman*, 18 Cal. 4th at 183-84, 955 P.2d at 459, 74 Cal. Rptr. 2d at 833. There, the former husband took advantage of an early retirement incentive program offered by his employer, Pacific Gas and Electric Company (PG&E), which enhanced his retirement benefits both by removing the early retirement discount and by crediting him with three additional years of service. *In re Marriage of Lehman*, 18 Cal. 4th at 175, 955 P.2d at 453, 74 Cal. Rptr. 2d at 827. The court found that once a former spouse owns an interest in a pension, she also owns an interest in the retirement benefits as enhanced. *In re Marriage of Lehman*, 18 Cal. 4th at 179, 955 P.2d at 456, 74 Cal. Rptr. 2d at 830. This is so, the court reasoned, because the right to receive retirement benefits at all (earned, in part, during the marriage) underlies the right to the enhanced benefits. *In re Marriage of Lehman*, 18 Cal. 4th at 179-80, 955 P.2d at 456, 74 Cal. Rptr. 2d at 830. Moreover, all the parties own at the dissolution is a right to draw retirement benefits from a "stream of income" that will begin to flow when the pensioner-spouse retires. *In re Marriage of Lehman*, 18 Cal. 4th at 177, 955 P.2d at 454, 74 Cal. Rptr. 2d at 828. "The stream's volume at retirement may depend on various events or conditions after *** dissolution. [Citations.] Such events and conditions include *** changes in the retirement-benefit formula ***." *In re Marriage of Lehman*, 18 Cal. 4th at 178, 955 P.2d at 455, 74 Cal. Rptr. 2d at 829. In essence, the early retirement incentives at issue both there and here are changes in the way retirement benefits are calculated.

We find the reasoning of these three courts persuasive. We note, however, that their conclusion is not universal. For example, a Louisiana court held that early retirement incentives much like those involved in *In re Marriage of Lehman* were the separate property of the spouse who acquired them. *Hannan*, 761 So. 2d at 706. The court treated the right to receive the enhancements as separate and distinct from the right to receive the pension itself. Thus, the court found that because the incentive package did not come into existence until after the dissolution, the enhancements obtained as a result were the separate property of the pensioner. *Hannan*, 761 So. 2d at 706. The court also pointed out, "By virtue of her early retirement, [the pensioner-spouse] agreed to forego continued job benefits and

compensation that would have been classified as separate property." *Hannan*, 761 So. 2d at 707. Although this is undoubtedly true, early retirement also provided her with the opportunity to seek new employment if she so desired—the compensation for which would be classified as her separate property—or simply to enjoy free time earned sooner than originally anticipated, an intangible benefit that would not accrue to her former husband. Moreover, the right to receive an early retirement incentive package necessarily depends upon the right to receive the pension. The right to pension enhancements can have no existence independent of the right to receive a pension. We therefore hold that, in general, to the extent pension benefits are a marital asset, they are a marital asset as enhanced.

The *In re Marriage of Lehman* court noted that there may be exceptions to the rule it annunciated. Specifically, the court stated, "It is conceivable that, in a given case, a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits might not own a community property interest in the latter's retirement benefits as enhanced, *as perhaps where the right to the enhancement is not derivative.*" (Emphasis added.) *In re Marriage of Lehman*, 18 Cal. 4th at 180 n.2, 955 P.2d at 456 n.2, 74 Cal. Rptr. 2d at 830 n.2. The early retirement incentive programs at issue in all of the cases we have discussed did not require the early retirees to do anything more than retire early to qualify for the enhanced benefits at issue. The enhancements were, therefore, entirely derivative. In the instant case, by contrast, the enhancements were largely derivative of the retirement benefits earned throughout John's career, but they were partially earned by John's monetary contributions to the TRS retirement fund, which were unquestionably made from nonmarital funds.

Mary essentially argues that the enhancements are entirely derivative and should, therefore, be apportioned between the parties the same way the nonenhanced portion of John's benefits is apportioned. She cites *In re Marriage of Hunt*, 78 Ill. App. 3d at 661-62, 397 N.E.2d at 518, for the proposition that monetary contributions to a pension plan have no impact on the characterization of the benefits as marital or nonmarital. However, the rationale underlying the *In re Marriage of Hunt* court's holding demonstrates the flaw in Mary's position. The court quoted a Washington appellate court as follows:

" '*** [T]here is no distinction between a retirement plan financed through employee salary deduction[s] and one financed exclusively by the employer. If the employee is married, the plan is financed and rights are being purchased *either by community funds or community labor.*' " (Emphasis added.) *In re Marriage of Hunt*,

764

78 Ill. App. 3d at 661, 397 N.E.2d at 518, quoting *DeRevere v. DeRevere*, 5 Wash. App. 741, 745-46, 491 P.2d 249, 252 (1971).

The contributions here at issue were one-time payments of substantial amounts of money. We cannot say that a lump-sum payment of $13,788 by a teacher earning $35,226 per year is *de minimis*. Unlike the employee contributions to the profit-sharing program at issue in *In re Marriage of Hunt* or the pension plan at issue in *DeRevere*, the cash payments at issue here were not paid by regular deductions from John's paychecks over time. The payments thus are not accounted for in the proportionality fraction. Therefore, we agree with John that the November 2001 order gives Mary the benefit of his nonmarital contribution to the pension fund beyond that contemplated by the 1989 reservation of jurisdiction. For the reasons that follow, however, we do not agree with his contentions about the extent to which Mary is overcompensated by the order.

John contends that the enhancements are entirely nonderivative. He points out that had he not made the payments, he would not have received the enhanced benefits. He contends that the pension was enhanced by $256 per month because he opted for the 2.2 upgrade (the $1,980 he actually receives minus the $1,724 he would have received without the augmentation). Similarly, he contends that his benefits are enhanced $517.20 per month by virtue of the early retirement option (representing a 30% deduction from his $1,724 nonaugmented full pension). As a result, he contends, $773.20 per month is directly and solely attributable to his nonmarital monetary contributions and not subject to division. Had he not made the payments and retired when he did, he would have received only $1,206.80 per month.

The problem with John's argument is that his entitlement to the enhanced benefits flows *both* from his entitlement to receive pension benefits in the first place *and* from the lump-sum contributions. For one thing, we seriously doubt that any investment of $13,788, standing alone, would lead to immediate annuity proceeds of $9,278.40 annually ($773.20 per month). Had he not contributed to the plan through teaching for 31 years, he would not be eligible for the enhancements no matter how much money he paid into TRS. Moreover, the amount by which the early retirement option and 2.2 upgrade increased his pension was determined by the length of his service and the salary he ultimately obtained in a career that was worked 60% during the marriage. Therefore, although the pension was enhanced by these payments, John's years of service both during and after the marriage were essential to determining the amount. Even his eligibility to receive the enhanced benefits was earned during the marriage. Had John begun teaching after the dissolution, he would not have had the 20 years of service necessary for early retirement.

We can think of no principled way to detangle the portion of these enhancements attributable to John's efforts during his career (60% of which was marital) from that attributable to the lump-sum payments he made. Thus, we think the most rational and equitable way to do justice to both parties is to require Mary to pay her proportionate share of the contributions necessary for John to qualify for the enhancements. Were we to hold that John's monetary contribution was *de minimis* and that, therefore, Mary is not required to compensate him for her share of the enhancements, we think our holding would discourage pensioners in John's position from electing to contribute to such enhancements. His decision to pay for the incentives is economically advantageous to both parties. On the other hand, were we to hold that the enhancements are entirely nonmarital and should be subtracted from the amount of "each benefit check" subject to division, Mary would be deprived of a substantial portion of an asset earned in large part through her support during the marriage.

Nor do we think adding to the denominator of the proportionality fraction would yield a fair or accurate result. We note that the *Stouffer* court, in calculating the amount of Mr. Stouffer's pension to which Mrs. Stouffer was entitled, held that she was entitled to a portion of the total pension he actually received and that the denominator of the fraction in the formula was the total years credited to his retirement plan, including the five years added by the early retirement incentive program. *Stouffer*, 10 Haw. App. at 279, 867 P.2d at 231-32. The *In re Marriage of Lehman* court, however, reached the opposite result. The court explained why it refused to credit the pensioner-spouse with the three additional years of service his employer added in calculating his benefits: "Such years are fictive—they have no independent existence[ ] but are merely a means by which the employer effects the enhancement. *** Neither the community nor the employee spouse supplied the putative service credit ***. The employer did." (Emphasis omitted.) *In re Marriage of Lehman*, 18 Cal. 4th at 188, 955 P.2d at 462, 74 Cal. Rptr. 2d at 836.

At first blush, these cases would seem to provide support for John's suggestion that the denominator of the fraction used to determine the marital share of his pension should be increased. Essentially, John could earn the enhanced benefits either by working for an additional period of time or by making the contributions. Therefore, theoretically, it would make sense to treat his contribution as the equivalent of working for the period of time necessary to earn the same benefits without making the monetary contributions. Because the early retirement discount does not apply to teachers who retire before age 60 with 34 years of creditable service (40 ILCS 5/17—116(c)(4) (West

1998)), that period of time is two years. Therefore, we think the monetary contributions theoretically bought John two additional years of service rather than five. Further, because the school district paid five-sixths of the monetary contribution that eliminated the early retirement penalty, just as PG&E provided Mr. Lehman's 3 years of putative service, we think John's contribution only bought 4 additional months, the remaining 20 being bought by the school district's contribution.

There is, however, a significant difference between the early retirement plans at issue in *Stouffer* and *In re Marriage of Lehman* and the one at issue in the case at bar: John's retirement account was *not* credited with an additional two or five years. His benefits were calculated based on 32 years of service, not 34 or 37. The enhancement was accomplished, much as the enhancement in *Olivo*, simply by removing the penalty for early retirement. Thus, the correlation between the amount of time added to the fraction's denominator and the amount by which the pension benefits are enhanced is substantially less direct than in *Stouffer* and *In re Marriage of Lehman*. We note that the *Stouffer* court did not add to the denominator the five years added to Mr. Stouffer's age to reduce the early retirement discount. In short, John received no putative years of service to add to the denominator.

■ For the foregoing reasons, we hold that when an early retirement incentive enhances pension benefits, to the extent that such enhancements are derivative of the right to receive the pension as deferred compensation, the proportion of the enhancement that is marital property is exactly the same as the proportion of the pension as a whole that is marital. In the unusual case where the entitlement to such enhancements is not purely derivative, however, that portion of the enhancement not derived from the right to receive the pension itself is the pensioner's sole property. We note that because early retirement incentives come in a multitude of forms, the decision we reach concerning the most equitable method of apportionment in the circumstances present in the case at bar may not be the most equitable or logical method in all cases where this problem arises. We therefore decline to hold that trial courts must always apportion partially derivative pension enhancements through requiring reimbursements.

## III. CONCLUSION

For the foregoing reasons, we reverse the order of the trial court. We remand with directions to enter an order directing Mary to pay to John $4,201.22, representing her 30.47% interest in the pension

enhancements. The court may, in its discretion, order the payments made in installments over a period of time as it deems just.

Reversed; cause remanded with directions.

HOPKINS, P.J., and DONOVAN, J., concur.