**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190387-U

Order filed August 13, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* MARRIAGE OF BARBARA ANN GAVIN, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Petitioner-Appellee, | ) ) | Appeal No. 3-19-0387 |
| and | ) ) | Circuit No. 85-D-1005 |
| JOSEPH JOHN GAVIN, | ) ) | The Honorable David Garcia, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court.
Presiding Justice Lytton and Justice Schmidt concurred in the judgment.

**ORDER**

¶ 1     *Held*:   In an appeal in a divorce case, the appellate court found that the trial court properly entered both an initial and an amended qualified domestic relations order (QDRO) as to the ex-husband's pension. The appellate court, therefore, affirmed the trial court's judgment.

¶ 2     More than 30 years after her divorce was finalized, petitioner, Barbara Ann Gavin, sought to have the trial court enter a qualified domestic relations order (QDRO) for the pension of her ex-husband, respondent, Joseph John Gavin, as provided for in the parties' marital settlement agreement. Joseph, who had retired several years prior, opposed the entry of the QDRO.

Despite Joseph's opposition, the trial court entered the QDRO. The parties later learned that the pension plan had rejected the QDRO because it contained errors or did not comply with the pension plan's requirements. Joseph filed an amended motion to reconsider the entry of the QDRO, and the trial court denied the motion after a hearing. An amended QDRO was presented to allegedly correct the errors in the initial QDRO and was later entered by the trial court. Joseph filed a motion to reconsider the entry of the amended QDRO, and the trial court again denied the motion following a hearing. Joseph appeals. We affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        Barbara and Joseph were married on March 17, 1967, and had three children. In 1985, when Joseph was 39 and Barbara was 37, Barbara filed for divorce. The divorce was finalized two years later on April 6, 1987, and a judgment for dissolution of marriage (judgment) was entered at that time. Attached to and incorporated into the judgment was the parties' marital settlement agreement.

¶ 5        Of relevance to this appeal, article IV, section 4 (hereinafter referred to as the pension clause or pension provision), of the marital settlement agreement addressed how Joseph's pension with his employer, International Business Machines (IBM), would be divided between the parties. The pension clause provided that:

> "The parties hereto agree that Joseph has a pension plan with his
> employer, IBM, and that the approximate present value of said pension is $7,500.
> The parties hereto agree that said pension is marital property and shall be divided
> equally between the parties hereto in accordance with and pursuant to the
> language and formula set forth in the case of In Re the Marriage of HUNT, 34
> ILL. DEC. 55. The parties hereto agree to assist and cooperate in obtaining the

2

entry of a Qualified Domestic Relations Order prepared by legal counsel for

BARBARA subsequent to the entry of a judgment of Dissolution of Marriage."

¶ 6    On March 13, 2019, Barbara's attorney filed a notice in the trial court indicating that he was going to appear before the court on March 22, 2019, and that he was going to present to the court the QDRO that was attached to the notice. A copy of the notice and the proposed QDRO were sent to both Joseph and his attorney.

¶ 7    Of relevance to this appeal, the proposed QDRO provided that the marital portion of Joseph's pension was to be determined by multiplying Joseph's accrued pension benefit by a certain specified fraction. The numerator of the fraction was the "[n]umber of months of service credited to [Joseph] under the terms of the Plan during marriage." The denominator of the fraction was the "[n]umber of months of service credited to [Joseph] under the terms of the Plan up to the earlier of the termination of [Joseph's] employment or commencement of benefit payments to [Barbara]."

¶ 8    On March 22, 2019, both parties' attorneys were present in court and the trial court entered the QDRO. Other than the entry in the trial court's docket sheets and the QDRO itself, no record of the March 22 court proceedings has been provided in this appeal.

¶ 9    On April 16, 2019, Joseph's attorney filed a motion to reconsider the entry of the QDRO. An amended motion to reconsider was later filed. In the amended motion, Joseph's attorney alleged, among other things, that: (1) the language of the pension provision was ambiguous and did not clearly define what the parties had agreed to in the judgment; (2) Joseph had retired approximately 15 years after the judgment had been entered; (3) Barbara should be barred by the doctrine of latches from obtaining the QDRO because of her failure to use due diligence to have the QDRO entered for nearly 30 years after the judgment for dissolution was entered; (4)

3

Barbara had not provided any reason for her failure to enter a QDRO prior to that time; (5) Joseph would be prejudiced by the entry of a QDRO so many years later because he had made "substantial lifestyle choices" without a QDRO having been entered; (6) after the QDRO had been entered, IBM notified the parties that the QDRO contained certain errors and that the pension plan would not accept the QDRO; and (7) the trial court judge, who was not the judge who had presided over the parties' divorce, was not sufficiently prepared to rule upon the entry of the QDRO.

¶ 10        On May 23, 2019, a hearing was held on Joseph's amended motion to reconsider. The only evidence presented at the hearing was the brief testimony of Joseph.[1] In his testimony, Joseph indicated that he and Barbara had separated in 1985 and that their divorce was finalized in 1987. At the time the divorce was finalized, Joseph worked for IBM and had a pension with IBM that had not yet vested. After the divorce was finalized, Joseph continued to work at IBM and his pension eventually became vested. In 2004, Joseph retired from IBM. In November 2018, Joseph was looking through some old files and saw a reference to $3750 with regard to the marital settlement. Confused by the reference, Joseph contacted Barbara and told her about it and also contacted his attorney. According to Joseph, prior to approximately 2018, Barbara never made any demand upon him for either the entry of a QDRO or for the payment of a portion of his pension. Joseph acknowledged, however, that Barbara never told him that she was not going to take a part of his pension. When asked whether he knew what the language in the pension clause referring to the *Hunt* case meant, Joseph stated that he did not know. Upon further questioning, Joseph indicated that the attorney who had represented Barbara in the

_____

[1] It appears from the record that a copy of the judgment for dissolution of marriage was informally presented to the trial court during the parties' closing arguments.

4

divorce was now deceased and could not be asked his opinion of what the language meant and that Joseph's own attorney from the divorce had no memory of what was done 30 years ago.

¶ 11      During the hearing on the motion, Barbara's attorney told the trial court that he had prepared an amended QDRO to correct the errors or omissions that the pension plan had pointed out in the initial QDRO. Joseph's attorney objected because he had not been given an opportunity to review the amended QDRO ahead of time. The trial court granted Joseph's attorney seven days to review the amended QDRO but indicated that it would enter the amended QDRO on the seven-day status date when Barbara's attorney returned to court.

¶ 12      In addition, in response to Joseph's argument of latches, the trial court stated:

> "I don't think latches attaches. I think that there is no harm to your client because if the QDRO was submitted at the day of the judgment, the figures would still have been the same. Actually, he got a benefit from it because he got 15 years to collect at a higher rate than he would have normally collected and then [INAUDIBLE] that this court is going to make him pay all of that back."

¶ 13      At the conclusion of the hearing, the trial court set the case for a seven-day status date for the entry of the amended QDRO.

¶ 14      On May 31, 2019 (the seven-day status date), when the parties' attorneys again appeared before the trial court, Joseph's attorney told the trial court that he wanted to have Joseph testify about what the person from the pension plan had told Joseph. The following conversation ensued:

> "THE COURT: Well, I am not going to have him testify to what somebody else says. If you want to bring that person in, that's fine after you set a

5

motion but today was just to enter the QDRO, not to continue the hearing that we already had.

[JOSEPH'S ATTORNEY]: Judge, the QDRO is a defective QDRO.

THE COURT: All right, right, and you have 31 days from—

[JOSEPH'S ATTORNEY]: And now—

THE COURT: --or thirty days from this date—

[JOSEPH'S ATTORNEY]: --he's going to have two QDROs that have been submitted, neither one has been approved.

[BARBARA'S ATTORNEY]: Judge, for the record, I sent this—I took the original QDRO to IBM. They said it is approved—

[JOSEPH'S ATTORNEY]: Objection, Judge. If you are going to not let me have somebody testify to hearsay, why—

THE COURT: We are not set for hearing and I am not going to have—if you want—if you are not agreeable, the Appellate Court is there.

[JOSEPH'S ATTORNEY]: I know where the Appellate Court is."

¶ 15        At the conclusion of the May 31, 2019, status hearing, the trial court entered the amended QDRO. The most notable difference between the initial and amended QDRO was that the amended QDRO contained an additional paragraph that was apparently omitted from the initial QDRO. The additional paragraph was titled "BENEFIT" (the benefit paragraph) and provided as follows:

"Consistent with the terms of the Plan, [Barbara] is entitled to receive fifty percent (50%) of the marital interest, as defined herein, of [Joseph's] monthly pension benefit, calculated based on number of month [*sic*] of benefit service

6

[Joseph] received from the date of marriage, March 17, 1967, up to and including the date the Judgment for Dissolution of Marriage was entered, April 6, 1987.

If the plan pays a cost of living increase, improvement or any other post-retirement benefit increase to [Joseph], the amount of any benefit payment [Barbara] is receiving or is eligible to receive will be increased by a proportionate share of any cost of living increase or any other post-retirement benefit increase.

[Barbara's] share of the accrued benefit shall not be adjusted for Social Security Leveling if elected by [Joseph]."

¶ 16 On June 17, 2019, Joseph filed a motion to reconsider the entry of the amended QDRO. In the motion, Joseph made the same arguments that he had made in his prior motion to reconsider—ambiguity, latches, and that the trial court was not sufficiently prepared to rule upon the QDRO. More specifically, as to his last argument, Joseph asserted that the trial court was not prepared to review the amended QDRO on the seven-day status date and had entered the amended QDRO without review or consideration, even though several changes had been made in the amended QDRO (as compared to the initial QDRO).

¶ 17 On June 27, 2019, a hearing was held on Joseph's motion to reconsider the entry of the amended QDRO. After listening to the arguments of the attorneys, the trial court denied the motion. Other than the entry in the trial court's docket sheets and the trial court's written order, no record of the June 27 court proceedings has been provided in this appeal.

¶ 18 On July 8, 2019, Joseph filed a notice of appeal in this case. Thereafter, Barbara filed a motion in the appellate court to dismiss Joseph's appeal for lack of appellate jurisdiction. This court denied the motion but instructed the parties to address any jurisdictional issues in their appellate briefs.

7

¶ 19                                    II. ANALYSIS

¶ 20                               A. Appellate Jurisdiction

¶ 21        Before we address the merits of Joseph's appeal, we must first determine whether we have appellate jurisdiction in this case. Barbara argues that appellate jurisdiction is lacking because Joseph failed to file a timely notice of appeal, as required by Illinois Supreme Court Rule 303 (eff. Jul. 1, 2017), within 30 days after the trial court denied Joseph's first motion to reconsider. In making that argument, Barbara maintains that the final judgment in this case was the initial QDRO. Barbara goes on to assert that although Joseph's first motion to reconsider extended the 30-day period for filing a notice of appeal, Joseph's second motion to reconsider, which raised the same issues as the first, was a successive posttrial motion and did not extend the 30-day period. Thus, Barbara contends that Joseph's notice of appeal was untimely because it was not filed within 30 days after the trial court denied Joseph's first motion to reconsider. Barbara asserts, therefore, that this court does not have appellate jurisdiction to rule upon the merits of Joseph's appeal.

¶ 22        Joseph argues that his notice of appeal was timely filed in this case and that this court has appellate jurisdiction to rule upon the merits of his appeal. In making that argument, Joseph asserts that the final order in this case was not the initial QDRO, as Barbara claims, but, rather, was the amended QDRO that the trial court later entered. Thus, Joseph contends that his second motion to reconsider—the only posttrial motion he filed directed against the amended QDRO— was not a successive posttrial motion and that it extended the 30-day period for filing an appeal. As a result, Joseph maintains, his notice of appeal was timely filed because it was filed within 30 days after the trial court entered an order denying his second motion to reconsider and that appellate jurisdiction exists in this case.

8

¶ 23        It is well established that jurisdiction is conferred upon the appellate court only through the filing of a timely notice of appeal.   Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); *Berg v. Allied Security, Inc.*, 193 Ill. 2d 186, 189 (2000).  If a timely notice of appeal has not been filed, the appellate court must dismiss the appeal for lack of appellate jurisdiction.  See *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539 (1984) (recognizing that an appellate court has a duty to determine if jurisdiction exists and to dismiss the appeal if jurisdiction is lacking).  Illinois Supreme Court Rule 303(a) (eff. July 1, 2017) sets forth the time requirements for filing a notice of appeal from a final judgment in a civil case.  Rule 303(a) provides that a notice of appeal must be filed within 30 days after the final judgment appealed from was entered or, if a timely posttrial motion directed against the judgment was filed, within 30 days after the order was entered disposing of the last pending postjudgment motion directed against the judgment.  Ill. S. Ct. R. 303(a) (eff. Jul. 1, 2017); *Berg*, 193 Ill. 2d at 189.

¶ 24        A party is generally allowed to file only one posttrial motion attacking the final judgment in a non-jury case.  See *Benet Realty Corp. v. Lisle Savings & Loan Ass'n*, 175 Ill. App. 3d 227, 234 (1988).  Thus, the filing of a successive posttrial motion (one that merely repeats what was set forth or could have been set forth in the preceding posttrial motion) will not extend the time period for filing an appeal under Supreme Court Rule 303.  See *Deckard v. Joiner*, 44 Ill. 2d 412, 418-19 (1970); *Benet Realty Corp.*, 175 Ill. App. 3d at 230-32.  However, that rule does not apply in a situation, such as the present case, where the trial court entered both an initial and an amended judgment and the defendant filed one posttrial motion as to each of those two judgments (the initial and the amended).  See *Gibson v. Belvidere National Bank & Trust Co.*, 326 Ill. App. 3d 45, 48-51 (2001).  To the contrary, when the trial court amends its initial final judgment, the amended order becomes the new final judgment, and the clock is reset for filing a

9

posttrial motion that attacks the new final judgment. See *id.* Under those circumstances, the deadline for filing a notice of appeal is extended to 30 days after the trial court enters an order disposing of the last pending posttrial motion that attacks the new final judgment. See Ill. S. Ct. R. 303(a)(1) (eff. Jul. 1, 2017) (setting forth the general 30-day requirement for the filing of a notice of appeal); Ill. S. Ct. R. 303(a)(2) (eff. Jul. 1, 2017) (indicating that when a party intends to challenge an order disposing of any postjudgment motion or separate claim or a judgment amended upon such motion, the party must file a notice of appeal or an amended notice of appeal within 30 days of the entry of said order or amended judgment); *Gibson*, 326 Ill. App. 3d at 48-51.

¶ 25        As indicated above, in this particular case, the trial court entered both an initial final judgment (the initial QDRO) and an amended final judgment (the amended QDRO). Joseph filed one posttrial motion, a motion to reconsider, as to each of those two final judgments. When the amended QDRO was filed, it became the new final judgment. See *Gibson*, 326 Ill. App. 3d at 48-51. Thus, the time period was reset for filing a posttrial motion attacking that new final judgment and for filing a notice of appeal. See *id.* Joseph's motion to reconsider the entry of the amended QDRO (Joseph's second motion to reconsider), therefore, was not a successive posttrial motion, and Joseph had thirty days from the trial court's ruling on that motion to timely file a notice of appeal in this case. See Ill. S. Ct. R. 303(a)(1), (a)(2) (eff. Jul. 1, 2017); *Gibson*, 326 Ill. App. 3d at 48-51. Joseph's notice of appeal was filed within that 30-day period and properly conferred appellate jurisdiction upon this court. See Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); *Berg*, 193 Ill. 2d at 189. Having found that appellate jurisdiction exists in this case, we now turn to address the merits of Joseph's appeal.

¶ 26                              B. Propriety of the Initial and Amended QDRO

¶ 27        On appeal, Joseph argues that the trial court erred in granting Barbara's requests to enter both the initial and the amended QDRO (collectively referred to hereinafter as the QDRO, unless otherwise specified). Joseph asserts that the trial court should not have entered the QDRO for three main reasons. First, Joseph contends that the QDRO should not have been entered because the pension clause of the marital settlement agreement was ambiguous and needed to be interpreted. In support of that argument, Joseph points to the statement in the pension clause that the present value of the pension was $7500 and claims that the statement was an indication that the parties intended to use the offset method to divide the pension and that the only pension amount that the parties intended to divide was the $7500. According to Joseph, further indications of the parties' intent to use the offset method can be seen in the fact that the marital settlement agreement provides for a lump-sum distribution of other assets, that the judgment of dissolution indicates there were ample assets to award Barbara a $3750 lump-sum payment for her share of the pension, that no QDRO was presented within a reasonable time period after the divorce, and that the offset method was allegedly the preferred method for dividing a pension in 1989 when the judgment and marital settlement agreement were entered. At the very least, Joseph maintains, the trial court should have conducted a full hearing on the matter before ruling on the entry of the QDRO. Second, Joseph contends that the QDRO should not have been entered because the entry of the QDRO was barred by the doctrine of latches. In making that argument, Joseph asserts that latches applies in this case because Barbara waited over 30 years to obtain the QDRO, because Barbara presented no reason for the delay, and because Joseph was prejudiced by the delay since he based his financial decisions over the past several years on the absence of a QDRO and since much of the evidence regarding the parties' intent as to the pension provision is no longer available. Third, Joseph contends that the QDRO should not have

11

been entered because the trial court was not properly prepared to rule upon such a complicated matter since the trial court judge was not the same judge who had presided over the parties' divorce; did not have the court file, the judgment for dissolution, or the marital settlement agreement (at times) when he made his rulings; did not hold a full hearing on the matter prior to the entry of the QDRO; did not review the *Hunt* case; was not aware of the complexities of this case; assumed that the *Hunt* formula was the proper formula to be used; never considered or weighed the argument that the increased value of the pension from the divorce until Joseph retired should not have been made part of the QDRO; assumed that the amended QDRO was the same as the initial QDRO; and ultimately entered two QDROs that were inconsistent with each other and inconsistent with the language of the pension clause. For all of the reasons stated, Joseph asks that we overturn the rulings of the trial court that entered both the initial and amended QDRO.

¶ 28    Barbara argues that the trial court's entry of the QDRO (both the initial and the amended QDRO) was proper and should be upheld. In support of that argument and in response to Joseph's specific claims of error, Barbara asserts first that the language of the pension provision is not ambiguous and that it specifically provides that the pension is to be divided between the parties using the *Hunt* formula. Second, and in the alternative, Barbara asserts that even if the pension provision is ambiguous, when the provision is considered along with the remainder of the marital settlement agreement, it becomes clear that the parties intended to divide the pension using a reserved jurisdiction approach, which was done in the present case. Third, Barbara asserts that the doctrine of latches does not apply in the instant case because Joseph did not suffer a material detriment as a result of Barbara's delay and, instead, received a substantial monetary benefit. Fourth, Barbara asserts that the trial court was properly prepared to rule upon

12

the entry of the QDRO and did not need to receive additional evidence about the matter since the pension provision was unambiguous. In making that fourth assertion, Barbara notes that Joseph was given a full hearing on the matter when a hearing was held on the first motion to reconsider and that only one QDRO—the amended QDRO—controls the division of the pension in this case since the pension plan did not accept the first QDRO. For all of the reasons set forth, Barbara asks that we affirm the trial court's judgment, entering the QDRO (both the initial and the amended QDRO) in the instant case.

¶ 29        As indicated above, the primary issue raised by Joseph in this appeal calls upon this court to interpret the provisions of the parties' marital settlement agreement. The interpretation of a marital settlement agreement, like any other contract, is a question of law and is subject to *de novo* review on appeal in accordance with the general rules applicable to contract interpretation. *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009). However, to the extent that we are also called upon to determine whether the trial court correctly denied Joseph's claim of latches, that is an issue to which we apply an abuse of discretion standard of review on appeal. See *Hannigan v. Hoffmeister*, 240 Ill. App. 3d 1065, 1074 (1992).

¶ 30        The primary goal of contract interpretation is to give effect to the intent of the parties. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007); *In re Marriage of Schurtz*, 382 Ill. App. 3d 1123, 1125 (2008). In determining the intent of the parties, a court must consider the contract document as a whole and not focus on isolated portions of the document. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007); *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164 (2002). If the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract document itself, which should be given its plain and ordinary meaning, and the contract

13

should be enforced as written. *Virginia Surety Co.*, 224 Ill. 2d at 556; *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990); *Reaver v. Rubloff-Sterling, L.P.*, 303 Ill. App. 3d 578, 581 (1999); *Schurtz*, 382 Ill. App. 3d at 1125. However, if the contract language is ambiguous in that it is susceptible to more than one reasonable interpretation, the meaning of the contract language must be ascertained through a consideration of extrinsic evidence. *Gallagher*, 226 Ill. 2d at 233; *Schurtz*, 382 Ill. App. 3d at 1125; *Reaver*, 303 Ill. App. 3d at 581.

¶ 31 There are two different approaches that a trial court may use to value an unmatured pension upon the dissolution of a marriage: the immediate offset approach and the reserved jurisdiction approach. *In re Marriage of Richardson*, 381 Ill. App. 3d 47, 53 (2008). Under the immediate offset approach, the trial court determines the present value of the pension benefit (or the marital portion of the pension benefit), awards the entire pension to the employee spouse, and awards the nonemployee spouse enough other marital property to offset the pension award. See *id.* at 53-54; *In re Marriage of Ramsey*, 339 Ill. App. 3d 752, 758 (2003). Thus, with the immediate offset approach, the trial court immediately compensates (at the time of dissolution) the nonemployee spouse for his or her share of the marital portion of the employee spouse's pension. See *Richardson*, 381 Ill. App. 3d at 53. The immediate offset approach is generally used when there is sufficient actuarial evidence to determine the present value of the pension (the marital portion of the pension), when the employee spouse is close to retirement age, and when there is sufficient other marital property to allow an offset to the nonemployee spouse. *Id.* at 54.

¶ 32 By comparison, under the reserved jurisdiction approach, the trial court does not immediately compensate the nonemployee spouse at the time of dissolution of the marriage. *Id.* Rather, the trial court awards the nonemployee spouse a percentage of the marital portion of the

14

pension and retains jurisdiction over the case so that it can order the employee spouse to pay the nonemployee spouse his or her share of the marital portion of the pension if, and when, the pension becomes payable. *Id.* The reserved jurisdiction approach is normally used when it is too difficult to place a present value on a pension due to uncertainty as to whether the pension will vest or mature or when the present value can be determined but a lack of other marital property makes it impractical or impossible to make an offset to the nonemployee spouse. *Id.* As the courts have noted, the reserved jurisdiction approach is particularly appropriate in situations where an interest has not yet vested at the time of dissolution because the approach divides the risk between the parties that a pension will fail to vest. See, *e.g.*, *id.*

¶ 33 The pension clause in the instant case called for the marital portion of Joseph's pension to be divided equally between the parties using the *Hunt* formula. Under the *Hunt* formula, the marital portion of the pension is determined by dividing the number of months or years the employee spouse accumulated pension benefits during the marriage by the total number of months or years that the employee spouse accumulated pension benefits prior to retirement or being paid. See *id.* at 52, 54-55; *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 663 (1979). As the formula itself implies, a trial court using the *Hunt* formula will generally take a reserved jurisdiction approach to the division of the pension and will retain jurisdiction over the case so that it can award the nonemployee spouse his or her share of the marital portion of the pension when the pension benefit becomes payable (when the employee spouse retires). See *Richardson*, 381 Ill. App. 3d at 52, 54-55; *Hunt*, 78 Ill. App. 3d 663.

¶ 34 After having reviewed the marital settlement agreement in the present case, we find that the pension provision is clear and unambiguous and that it calls for Joseph's pension to be divided equally between the parties using the *Hunt* formula. Pursuant to that formula, the trial

15

court was to determine the marital portion of the pension by dividing the number of months or years that Joseph accumulated pension benefits during the marriage by the total number of months or years that Joseph accumulated pension benefits prior to retirement or being paid. See *Richardson*, 381 Ill. App. 3d at 52, 54-55; *Hunt*, 78 Ill. App. 3d 663. That is exactly what both the initial and amended QDRO sought to accomplish in the present case. Consistent with the pension clause, both the initial and amended QDRO set forth a formula for determining the marital portion of Joseph's pension that mirrored the language of the *Hunt* formula. In addition, although omitted from the initial QDRO, the benefit paragraph of the amended QDRO specifically provided that Barbara was entitled to receive 50% of the marital portion of Joseph's monthly pension benefit, again consistent with the unambiguous language of the pension clause. We, therefore, conclude, based upon the facts of this case, that the trial court did not err when it entered both the initial and the amended QDRO. See *Richardson*, 381 Ill. App. 3d at 52, 54-55; *Hunt*, 78 Ill. App. 3d at 663; *Virginia Surety Co.*, 224 Ill. 2d at 556; *J.M. Beals Enterprises, Inc.*, 194 Ill. App. 3d at 748; *Reaver*, 303 Ill. App. 3d at 581; *Schurtz*, 382 Ill. App. 3d at 1125.

¶ 35        Although Joseph argues that the doctrine of latches bars the entry of the QDRO, latches does not apply under the facts of the present case because Joseph did not receive any type of material detriment due to Barbara's delay in obtaining the QDRO. See *Pyle v. Ferrell*, 12 Ill. 2d 547, 552 (1958) (setting forth various definitions of latches). In fact, as Barbara correctly points out, Joseph received a substantial monetary benefit—he was paid both his share and Barbara's share of the marital portion of the pension for the past several years. There is no indication in the record before us that Barbara has sought to be reimbursed for the payments that she has missed or for interest on those payments. In addition, no evidence was presented in the trial court proceedings to establish when Barbara learned that Joseph had retired or to indicate when

16

Barbara should have allegedly sought to have a QDRO entered. Furthermore, we cannot find that the delay prejudiced Joseph by causing a lack of available evidence regarding the parties' intent as to the pension provision. As noted above, the pension provision was clear and unambiguous. Thus, it would not have been permissible for Joseph to present additional evidence to establish the parties' intent in enacting the pension provision. See *Virginia Surety Co.*, 224 Ill. 2d at 556 (recognizing that when the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract document itself).

¶ 36    As a final matter, we note that we have not been provided with any type of a record for some of the important trial court proceedings in this case. Most notably, no record was presented for March 22, 2019, when the trial court entered the initial QDRO, or for June 27, 2019, when the trial court denied Joseph's second motion to reconsider. Joseph, as the appellant, had the burden of presenting a sufficiently complete record of the trial court proceedings to support his claim of error. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In the absence of a such a record, we will presume that the trial court's order was in conformity with the law and will resolve any doubts that arise from the incompleteness of the record against Joseph as the appellant. See *id.*

¶ 37                                    III. CONCLUSION

¶ 38    For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 39    Affirmed.