*In re* MARRIAGE OF ROBERT L. BLACKSTON, Petitioner-Appellant, and BARBARA J. BLACKSTON, Respondent-Appellee.

Fifth District   No. 5—92—0712

Opinion filed March 14, 1994.

Phillip A. Montalvo, of Wimmer, Stiehl & Montalvo, P.C., of Belleville, for appellant.

Patrick M. Flynn, of Flynn & Guymon, of Belleville, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

Robert Blackston is employed by the Federal civil service system and has a pension with the Civil Service Retirement System (the CSRS). He has participated in the CSRS continuously since September 1965. Robert and Barbara Blackston were married in 1968, and their marriage was dissolved in September 1992. Each spouse was awarded a portion of the other spouse's employment retirement benefits. Robert argues that the trial court's division of his CSRS pension is erroneous. We reverse and remand.

We will begin with an examination of the CSRS pension. Robert testified that his pension will provide benefits and an annuity upon his retirement. He currently contributes 7% of his gross salary through withholding, but the CSRS is primarily funded by his governmental employer and by Federal taxpayers. Robert's salary increases periodically due to cost-of-living allowances, promotions, and merit pay. Robert's CSRS pension is a defined-benefit plan, which means it has definitely determinable benefits and the contributions are not geared to profits. (See B. Goldberg, Valuation of Divorce Assets § 9.2, at 232 (1984).) Under a defined-benefit plan, as opposed to a defined-contribution plan, the benefits received by an employee are determined by a formula, which generally takes years of service and salary into consideration but which is not correlated with the amount of contribution made by the individual employee. Under a defined-contribution plan, each participant has a separate account, and the benefit earned by the employee is based on the balance in his or her account. (Kalcheim & Shapiro, *Retirement Plans Upon*

*Dissolution of Marriage Under the Retirement Equity Act of 1984*, 73 Ill. B.J. 600, 605 (1985).) It is undisputed that the plan at bar is structured so that Robert's yearly pension at retirement will amount to a percentage of his salary, and the percentage will be determined by a formula based upon Robert's highest three years of salary and the number of years of his employment.

Robert testified that he has contributed $52,360 to the CSRS since he began working for the Federal civil service system in 1965. At the time of trial, September of 1992, Robert's salary was $65,500, and he was 48 years old. He testified on September 9, 1992, that if he retired that day he could not collect any benefits until age 62, but his benefit would be fixed at $30,248 per year beginning at age 62. The earliest Robert could retire and collect an immediate benefit would be at age 55, because he would have 30 years of service in the system. With retirement at age 55 Robert's benefits would be greater than $30,248 per year because his highest three years of salary and the number of years of service would be greater. If Robert retires at age 62, he will have 40 years of service invested in the system and his benefits would be further increased.

Frank Spreng, a college faculty member with a doctorate in economics, testified that Robert's attorney asked him to determine the value of Robert's pension and to ascertain a method of partitioning the asset. Spreng testified that there is no connection between the amount Robert contributes to the pension and the actual dollar amount he will receive. Benefits are determined by calculating Robert's length of employment in the system and the average of the three highest years of salary earned.

Using the date of trial, September 9, 1992, as a reference point, Spreng used the following table to illustrate his calculations:

| | |
|---|---|
| Average of High Three Years' Salary times: Pension | $60,315 |
| Percentage | .5015 |
| Annual Amount of Pension When Mr. Blackston is | $30,248 |
| Age 62 times: Percentage for Mrs. Blackston | .44 |
| Mrs. Blackston's Annual Amount | $13,309 |
| Mrs. Blackston's Monthly Amount Beginning on 11/13/05 | $ 1,109 |
| These Payments Have a Present Value As of 9/9/92 | $61,939. |

The figure of $60,315 represents the average of the last three high years of salary Robert earned. This amount is multiplied by .5015, which is the percentage provided by the CSRS pension to determine the annual amount of pension benefits. Thus, if Robert retired on September 9, 1992, $30,248 is the amount Robert would be entitled to receive annually at age 62. The figure of .44 is derived in two steps.

First, the percentage amount of the proportion of the pension rights that were accrued during the marriage is calculated by dividing the number of years of the marriage by the number of years Robert was employed, which equals .88. This proportion is then divided by two, which represents an equal split of the marital property. Spreng multiplied $30,248 by .44 to ascertain the annual amount of pension benefits Barbara would receive assuming Robert's retirement at age 62. The last figure on the table, $61,939, was the present value of Barbara's future benefits. Spreng explained that if $61,939 was invested that day at 7.7%, then beginning on November 13, 2005, $1,109 a month could be withdrawn from that fund for 13 years, which would be Robert's remaining life span at age 62.

In addition to these benefits, the CSRS pension provides for a survivor-spouse annuity which allows a spouse to continue receiving benefits after the employed spouse dies. When Robert retires, he would have the option of electing to purchase a survivor-spouse annuity. Frank Spreng did not take into account the cost of the survivor-spouse annuity in calculating benefits. Spreng testified, however, that if the parties take advantage of the survivor-spouse annuity and if Robert dies, Barbara would continue receiving 55% of the value of the total pension. The survivor-spouse annuity costs approximately 8% of the value of the whole pension at the time the recipients of the pension benefits begin receiving benefits.

The trial court entered an order dividing Robert's pension according to a formula:

> "Respondent [Barbara] shall receive a portion of Petitioner's [Robert's] retirement benefits available to him under the Civil Service Retirement System, which shall be computed by multiplying Petitioner's gross monthly benefit by a fraction, the numerator of which is the number of years Petitioner has been a member of the Civil Service Retirement System during the marriage, and the denominator shall be the Petitioner's total number of years in the Civil Service Retirement System, and dividing the product by two. In addition, Petitioner is barred from obtaining a refund of his contributions."

Robert argues that the trial court's assessment of Barbara's portion of the pension benefits was erroneous because the court failed to discount the benefits to reflect that portion of the pension rights acquired during the marriage. Robert maintains that the value of his pension will be enhanced through his own efforts *beyond* the date of the dissolution of his marriage and that such increases should be discounted from the amount awarded to the nonemployee spouse. He argues that the trial court's method of calculating Barbara's benefits

is in effect an award of maintenance because the benefit that is ultimately going to be paid will be an enhanced amount due to Robert's postdissolution efforts. Robert contends that Barbara is entitled to $61,939 present-day value in the pension, as calculated by his expert Frank Spreng, and that the correct sum to be protected by the survivor-spouse annuity is $13,309.

Barbara believes the trial court properly calculated her portion of Robert's retirement benefits. Barbara claims that Robert's theory of pension division erroneously employs both the immediate-offset approach and the reserved-jurisdiction approach. Barbara argues that Robert wants to calculate the monthly amount of pension he would receive and apply an immediate-offset percentage to that monthly amount. Barbara concedes that this would be fine if Robert immediately started paying this amount to her. Barbara points out, however, that Robert then desires to utilize a reserved-jurisdiction approach to delay making payment to Barbara until he actually retires, a procedure which she feels is inequitable. She argues that allowing Robert to benefit from the inherent growth of the pension, the body of which she claims was developed during the marriage, would be the equivalent of awarding a marital savings account to him, would allow him to retain all interest on the account for 14 years, and would only then return to Barbara her original marital share of the savings account.

This review of the pension plan and the parties' arguments as to how it should be distributed leads us to an examination of the law as it has developed in this area. In the past, society did not treat marriage as a union of equal partners. Instead, the assets accumulated during the marriage belonged to the income-earning spouse. (Throne, *Pension Awards in Divorce and Bankruptcy*, 88 Colum. L. Rev. 194, 195 (1988) (hereinafter *Pension Awards*).) As noted by one scholar, however, the traditional view of marriage is being replaced by the concept that marriage is a partnership between coequals.

> "Current social and legal trends stress 'sharing principles' in the marital relationship rather than a support-dependency structure. The underlying premise is that both parties work together and make individual sacrifices to enhance the wealth and security of the marital unit. *** [S]tates have defined pensions and other less tangible assets as marital property, giving the view of marriage as a partnership more substance by attempting to divide the career assets of the spouses as well as any real property accumulated during the marriage." *Pension Awards*, 88 Colum. L. Rev. at 196.

*In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653, 397 N.E.2d 511, considered distribution of a pension plan in a divorce case. *Hunt* used

the immediate-offset approach in distributing the pension and described that approach as follows:

> "Once the trial court has determined the present value of that part of the pension or profit-sharing interest which is marital property, the trial court may award the interest to the employee spouse and give the nonemployee spouse other marital property to offset her marital share in the interest." (*Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519.)

The reserved-jurisdiction approach, or "if, as, and when" approach, was also described in *Hunt*:

> "In those instances where it is difficult to place a present value on the pension or profit-sharing interest due to uncertainties regarding vesting or maturation, or when the present value can be ascertained but the type, or lack, of other marital property makes it impractical or impossible to award sufficient offsetting marital property to the nonemployee spouse, then the trial court in its discretion may award each spouse an appropriate percentage of the pension to be paid 'if, as and when' the pension becomes payable." (*Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519.)

By 1982, the Illinois Appellate Court recognized the potential difficulty that could result from awarding the employee-spouse the pension plan and the non-pension-owning spouse an offsetting asset. (H. Gitlin, Gitlin on Divorce § 8.09(A)(9), at 141 (1993) (hereinafter Gitlin on Divorce).) The shift from the immediate-offset approach to the reserved-jurisdiction approach became apparent in *In re Marriage of Wisniewski* (1982), 107 Ill. App. 3d 711, 437 N.E.2d 1300:

> "If a trial court deems it best to divide the pension interest prior to vesting, it must take the value of the pension as determined by actuarial evidence, discount this amount to an extent in consideration of the probability it will not vest, discount to present value, and then determine the marital portion of that amount. In some cases the trial court may be able to evaluate this risk in determining the value. ***
>
> Where this method proves impractical, the court may choose to postpone a decision on the ultimate method of apportionment of pension rights until the rights vest. This can be accomplished by the court simply awarding 'each spouse an appropriate portion of each pension payment as it is paid.' This method 'will require the court to continue jurisdiction to supervise the payments of pension benefits.' " (*Wisniewski*, 107 Ill. App. 3d at 717, 437 N.E.2d at 1305.)

One is cautioned that the reserved-jurisdiction approach should not be confused with the trial court's reserving jurisdiction in order to later make a decision as to how the pension should be distributed.

Failure by the trial court to make a ruling on the appropriate distribution of the pension plan would make the trial court's judgment not appealable because it would not be a final judgment disposing of all matters. (Gitlin on Divorce § 8.09(A)(10), at 142-43, citing *In re Marriage of Rosenow* (1984), 123 Ill. App. 3d 546, 462 N.E.2d 1287; *In re Marriage of Britton* (1986), 141 Ill. App. 3d 588, 490 N.E.2d 1079.) The reserved-jurisdiction approach has been utilized repeatedly in Illinois. See *In re Marriage of Whiting* (1989), 179 Ill. App. 3d 187, 534 N.E.2d 468; *In re Marriage of Korper* (1985), 131 Ill. App. 3d 753, 475 N.E.2d 1333; *In re Marriage of Keller* (1982), 108 Ill. App. 3d 556, 439 N.E.2d 44; *In re Marriage of Fairchild* (1982), 110 Ill. App. 3d 470, 442 N.E.2d 557.

■ Commentators have recognized that there are several items involved in pension evaluation:

"a. The terms of vesting determining the benefits to the employee who quits or is fired from the job prior to retirement,

b. The benefits at retirement,

c. The loss of retirement benefits if disability benefits are obtained,

d. The availability or lack of availability of options providing continuing benefits to the unemployed spouse in the event of the death of the employee after retirement,

e. The rights of the employed spouse to elect alternative retirement plans,

f. Lump sum payment in lieu of retirement payments,

g. Early retirement,

h. Late retirement,

i. Death benefits in lieu of retirement, and

j. Every other conceivable combination of these factors." (B. Goldberg, Valuation of Divorce Assets § 9.5, at 249 (1984).)

Our concern is that the trial court was furnished evidence on only (a), (b), and (g). Apparently the trial court accepted Barbara's contention that the dollars made in the early years of Robert's employment history are entitled to greater weight than dollars made in later years because the earlier dollars have had many more years to grow through accumulation of interest on investment. While this may be a proper consideration, it is not supported in any detail by any evidence in this record, and without such evidence it does not provide a sufficient basis to impose a burden upon the increases in pension benefits that are earned after the dissolution.

■ We conclude that the trial court erred in granting Barbara benefits based upon increases in Robert's pension after the dissolution. Upon remand the court may wish to hear evidence upon some of the other elements and to make some other adjustment to its disposition

of pension benefits to account for the greater weight to be given contributions to the plan during the early years of Robert's employment. See Bonavich, *Allocation of Private Pension Benefits as Property in Illinois Divorce Proceedings*, 29 DePaul L. Rev. 1, 27 (1979).

■ Robert argues that the trial court abused its discretion when it prohibited him from obtaining a refund of his contributions to the CSRS. Robert contends that there is no legal or factual basis to support the court's decision. Robert does not cite any authority in support of his position.

It is a general rule of appellate practice that an appellant may not make a point merely by stating it without presenting arguments in support of it. This court will not research and argue a case for an appellant. (*Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647, 432 N.E.2d 1267, 1272.) Robert devotes less than a page in his brief to the issue regarding the prohibition against obtaining a refund of his CSRS contributions. We find his presentation to this court fails to satisfy the rule that an appellant marshall and present contentions, authorities, and page references appropriate to the issues. (See *Piper v. Moran's Enterprises* (1984), 121 Ill. App. 3d 644, 459 N.E.2d 1382.) We, thus, consider the issue regarding the refund of contributions waived for purposes of this appeal.

■ The final point Robert raises for our consideration is the trial court's allocation of the former-spouse-survivor annuity. The trial court's order directed:

> "Respondent [Barbara] shall receive a Former Spouse Survivor Annuity equal to 48.5% of Petitioner's annuity and the costs associated with providing the Former Spouse Survivor Annuity shall be deducted from Respondent's share of Petitioner's monthly retirement benefits. The Court has calculated the Former Spouse Survivor Annuity by multiplying 88.1% times 55%, which is the maximum Survivor Annuity amount."

Robert argues that the court's award of 48.5% is erroneous. He maintains that the court awarded Barbara 88.1% of the entire former-spouse-survivor benefit, and because the parties were married 88.1% of the time Robert has been in the CSRS, Barbara's award is the equivalent of a 100% interest in the annuity. This, Robert argues, is inequitable because it gives Barbara a benefit that will accrue or increase in value, due to his postdissolution earnings and labor. Robert also contends that the allocation of 88.1% of the annuity to her denies him the opportunity to allocate the majority of the annuity to a future spouse or to his children.

We agree. While the trial court was correct to order Barbara to

receive a former-spouse-survivor annuity, it abused its discretion in awarding 88.1% of it to Barbara. On the pension itself the trial court found the coverture apportionment to be .88 and attributed 50% of that, or .44, to Barbara. The attribution of a similar amount on the survivor-spouse annuity would be more appropriate under the circumstances of this case.

Therefore, we reverse and remand so that the trial court may consider additional evidence consistent with the conclusions in this opinion.

Reversed and remanded.

WELCH and MAAG, JJ., concur.