# Illinois Official Reports

## Supreme Court

***Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund*, 2018 IL 122793**

| | |
|---|---|
| Caption in Supreme Court: | ROCHELLE CARMICHAEL *et al.*, Appellees and Cross-Appellants, v. LABORERS' & RETIREMENT BOARD EMPLOYEES' ANNUITY & BENEFIT FUND OF CHICAGO *et al.*, Cross-Appellees (The State of Illinois *ex rel.* Lisa Madigan, Attorney General, Appellant and Cross-Appellee). |
| Docket Nos. | 122793, 122822 cons. |
| Filed | November 29, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County; the Hon. Celia G. Gamrath and the Hon. Mary L. Mikva, Judges, presiding. |
| Judgment | Circuit court judgments affirmed in part and reversed in part. Cause remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of Chicago, of counsel), for appellant. J. Peter Dowd, Justin J. Lannoye, and George A. Luscombe III, of Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich, of Chicago, for appellees. |

John F. Kennedy, Cary E. Donham, and Graham Grady, of Taft Stettinius & Hollister LLP, of Chicago, for cross-appellee Laborers' and Retirement Board Employees' Annuity and Benefit Fund of Chicago.

Mary Patricia Burns, Vincent D. Pinelli, and Martin T. Burns, of Burke Burns & Pinelli, Ltd., of Chicago, for cross-appellees Municipal Employees' Annuity and Benefit Fund of Chicago and Retirement Board of the Municipal Employees' Annuity and Benefit Fund of Chicago.

Justices JUSTICE THOMAS delivered the judgment of the court, with opinion.
Chief Justice Karmeier and Justices Kilbride, Garman, Burke, Theis, and Neville concurred in the judgment and opinion.

**OPINION**

¶ 1 This case involves challenges to the applicability and constitutionality of Public Act 97-651 (eff. Jan. 5, 2012), which altered articles 8, 11, and 17 of the Illinois Pension Code (40 ILCS 5/arts. 8, 11, 17 (West 2012)). The individual plaintiffs are nine retired or working employees (or in one instance a surviving spouse of a deceased former employee) of the City of Chicago (City) or Chicago Board of Education. These individual plaintiffs are all participants[1] in one of three public pension funds—the Laborers' and Retirement Board Employees' Annuity and Benefit Fund of Chicago (LABF), the Municipal Employees' Annuity and Benefit Fund of Chicago (MEABF), and the Public School Teachers' Pension and Retirement Fund of Chicago (CTPF). These three public pension funds, along with their governing boards, are named as defendants (hereinafter also referred to collectively as the Funds). Additionally three local labor organizations intervened as union plaintiffs.

¶ 2 The parties eventually filed cross-motions for summary judgment in the circuit court of Cook County. Plaintiffs challenged the constitutionality of three reforms in Public Act 97-651 that modify the calculation of annuities. The Attorney General appeared on behalf of the State of Illinois and intervened as a defendant to defend the constitutionality of Public Act 97-651, while the Funds argued against jurisdictional, declaratory, and equitable claims raised by plaintiffs. In the course of granting in part and denying in part the competing motions for summary judgment, the circuit court invalidated two distinct provisions of Public Act 97-651, ruling that they violated the pension protection clause of the Illinois Constitution (Ill. Const. 1970, art. XIII, § 5).[2] The circuit court upheld the constitutionality of the third reform of

---

[1]Or, as is the case with one of the plaintiffs, a survivor of a participant.

[2]Only one of the two provisions found unconstitutional by the circuit court is at issue in this appeal.

Public Act 97-651 challenged by plaintiffs. The parties appealed directly to this court, and we consolidated the two appeals.

¶ 3                                                    BACKGROUND

¶ 4        The Funds calculate pension annuities for their participants through a formula established by the Illinois Pension Code in articles 8 (governing the MEABF), 11 (governing the LABF), and 17 (governing the CTPF). The inputs for the formula are derived from the years of service of an employee, dictating the percentage of the employee salary, multiplied by the highest average annual salary in the last few years before retirement. See, *e.g.*, 40 ILCS 5/8-138(g-1), 11-134(f-1), 17-116 (West 2010). Participants thus have incentives to serve as public employees for long stretches of their careers to obtain the highest percentage and to increase their salaries to obtain a higher annuity. For decades, members in the three defendant pension Funds had the right to contribute to the Funds to receive service time for employment with private unions while on leaves of absence from their public positions with the City or the Chicago Board of Education. Participants were also able to apply their higher private union salary to the public annuity calculation.

¶ 5        Before Public Act 97-651, a teacher participating in the CTPF who wanted to earn union service credit had to receive a leave of absence from the Chicago Board of Education to work for a labor organization. *Id.* § 17-134(4). The teacher was also required to make the statutory employee contributions to the CTPF based on the percentage of the teacher's salary earned from the labor organization. *Id.* If the teacher's union salary exceeded the salary he would have earned in his Chicago Board of Education position but for the leave of absence, the labor organization was required to contribute "to the [CTPF] the employer's normal cost as set by the [CTPF] Board on the increment." *Id.* There was no limitation on when the teacher had to begin his union leave of absence to earn union service credit.

¶ 6        The requirements for earning union service credit in the LABF and MEABF differed somewhat from the CTPF. Before Public Act 97-651, LABF and MEABF participants could receive credit for "[l]eaves of absence without pay *** during which a participant is employed full-time by a local labor organization that represents municipal employees." *Id.* § 8-226(c); see also *id.* § 11-215(c)(3). To do so, the participant, or the labor organization on the participant's behalf, had to make all of the "employee" and "employer" contributions to the Funds. *Id.* §§ 8-226(c), 11-215(c)(3). Those contributions were "based on his current salary with such labor organization." *Id.* The participant could earn union service credit only if "the participant does not receive credit in any pension plan established by the local labor organization based on his employment by the organization." *Id.* As in the CTPF, there was no restriction in the Pension Code regarding when the LABF or MEABF participant had to begin his leave of absence in order to earn union service credit.

¶ 7        Following negative press coverage, the General Assembly made a number of changes to these union service credit benefits, two of which are at issue in this appeal.

¶ 8        First, Public Act 97-651 (Act) (eff. Jan. 5, 2012) eliminated a participant's right to contribute to the Funds and earn union service credit for a leave of absence beginning after the effective date of the Act, January 5, 2012. Before the Act, there was no restriction on when a participant had to begin a leave of absence in order to contribute to the Funds to earn union service credit.

¶ 9    Second, the Act amended the LABF and MEABF articles to state that only a salary paid by one of the defined public employers could be used to calculate the "highest average annual salary" upon which participants' pensions were based. Applicable to LABF, the General Assembly added a new subsection (e) to section 11-217 of the Pension Code to provide as follows: "This Article shall not be construed to authorize a salary paid by an entity other than an employer, as defined in Section 11-107, to be used to calculate the highest average annual salary of a participant. This subsection (e) is a declaration of existing law and shall not be construed as a new enactment." 40 ILCS 5/11-217(e) (West 2012). The Act made an essentially identical amendment applicable to the MEABF. See *id.* § 8-233(e). As defined by articles 8 and 11, an "employer" under the Pension Code only includes public employers such as the City or the Chicago Board of Education. *Id.* §§ 8-110, 11-107.

¶ 10   The legislative amendments ended the LABF and MEABF boards' decades-long practice of calculating pensions using union salaries earned by the participants on leaves of absence and upon which their contribution to the Funds were based. In both systems, pensions are generally calculated by multiplying the participants' years of service credit by a statutory multiplier (2.4%) and by the participants' "highest average annual salary for any 4 consecutive years in the last 10 years of service." 40 ILCS 5/8-138(g-1), 11-134(f-1) (West 2010); see also *id.* §§ 8-138(b), 11-134(a). If a participant's union salary from a leave of absence during which he contributed to the Funds for union service credit was among the highest consecutive 4 years in the last 10 years of service before retirement, the LABF and MEABF boards calculated that "highest average annual salary" using the union salary.

¶ 11   The legislature's purported "clarification" of the law, in adding new subsections (specifically, sections 8-233(e) and 11-217(e)) to provide that only a salary paid by a defined public employer could be used to calculate "highest average annual salary," required additional changes to the Pension Code as it existed before Public Act 97-651. This is because a member on a leave of absence working for a union in his last years of service before retirement does not earn a salary from a public employer upon which a pension could be calculated under the above-noted amendments without more. The void was filled by Public Act 97-651's amendment to section 8-138(g-1) and section 11-134(f-1) to provide that "final average salary" be calculated by using the salary before the leave of absence and adding an adjustment for inflation based on the Consumer Price Index for each year of the leave of absence. Pub. Act 97-651 (eff. Jan. 5, 2012) (amending 40 ILCS 5/8-138(g-1), 11-134(f-1)).

¶ 12   Thus, under the amendments, when a participant has union service credit, his pension would not be based upon the salaries he actually earned and upon which he contributed to one of the Funds in his last 10 years of service. Instead, the pension would be calculated based on the salaries he earned before the leave of absence began plus an inflation adjustment. In cases where the participant had been on an extended leave, these salaries from before the leave of absence began would have been earned by the participant years or even decades before his actual retirement. Those pre-leave-of-absence salaries could, therefore, be substantially less than the union salary the participant earned and upon which he contributed to the fund immediately before retirement.

¶ 13   Plaintiffs filed a multicount complaint against the Funds, alleging that plaintiffs worked for the City or Chicago Board of Education for years, or even decades, before taking leaves of absence to work for their unions to represent their coworkers in collective bargaining. Counts

- 4 -

IA, IIA, and IIIA of plaintiffs' complaint alleged that the amendments of Public Act 97-651 discussed above unconstitutionally diminished and impaired their retirement-system benefits in violation of the pension clause of the Illinois Constitution by (1) taking away the benefit of earning service credit for a future union leave of absence and (2) taking away the possibility of using a union salary to calculate "highest average annual salary." The complaint also alleged that the amendments violated the contracts and takings clauses of both the Illinois and United States Constitutions. Unrelated to the amendments accomplished by Public Act 97-651, plaintiffs also sought a declaration that language in section 8-226(c)(3) of the Pension Code (40 ILCS 5/8-226(c)(3) (West 2012)), barring union service credit for any participant who receives credit in "any pension plan" established by a local labor organization, does not apply to defined contribution plans.

¶ 14    The Attorney General on behalf of the State of Illinois intervened in the litigation to defend the constitutionality of the amendments and, joined by the defendant Funds, moved to dismiss plaintiffs' constitutional claims. On November 27, 2013, the circuit court entered an order denying defendants' motion to dismiss, finding that the right to earn union service credit was a retirement system benefit protected by the pension clause of the Illinois Constitution even if the participant had not exercised the option to take a leave of absence and earn union service credit before the amendments. The circuit court's order also denied defendants' motion to dismiss with respect to the question involving "highest annual salary calculations." The State had argued that the amendments did not change the law and insisted that preexisting statutory definitions of "salary" had always limited salary to one paid by a public employer. Rejecting that argument, the circuit court held that the definitions of "salary" in the Pension Code did not foreclose the use of the local labor organization salary in the calculation. The court concluded that, before the Act, the language of the statutes established that the legislature intended that LABF and MEABF members could calculate a pension based on the union salary that the participant actually earned during the leave of absence and upon which he contributed to the Funds. Thus, the Act's amendments changed the law, unconstitutionally diminishing plaintiffs' retirement system benefits.

¶ 15    The State filed a motion to reconsider the circuit court's rulings of unconstitutionality. On February 14, 2014, the circuit court denied the State's motion to reconsider its rulings with respect to the Act's amendments that eliminated the right to earn union service credit for leaves of absence after the effective date of the Act. In an order entered on September 29, 2014, however, the circuit court granted the State's motion to reconsider with regard to the amendments governing the calculation of "highest average annual salary." The court ruled that long-standing definitions of "salary" found in articles 8 and 11 of the Pension Code that preexisted Public Act 97-651 did indeed limit a "salary" to one paid by a public employer. Thus, despite decades of application of the statutes by the LABF and MEABF before the amendments to include the union salary in the calculation, the circuit court concluded that a highest average annual salary could not be calculated by using a salary paid by a local labor organization. Accordingly, the circuit court dismissed plaintiffs' claims challenging the "highest annual average salary" clarification by the legislature.

¶ 16    Following discovery and the filing of a first supplemental complaint by plaintiffs, the parties filed cross-motions for summary judgment. In a final order dated July 14, 2017, the circuit court ruled on the parties' motions. The court granted summary judgment for plaintiffs on counts IA, IIA, and IIIA, which stated the pension clause challenges to the amendments

eliminating the right to earn union service credit for leaves of absence beginning after the effective date of the Act. The State appeals directly to this court the judgment for plaintiffs on those counts.

¶ 17     In their supplemental complaint, plaintiffs alleged two new declaratory judgment counts (counts XIII and XIV) seeking to bar retroactive application of the amendments so that they would not impact the long-standing interpretation of the LABF and MEABF to allow use of a union salary in the "highest average annual salary" calculation. Plaintiffs alleged that, given members' reasonable detrimental reliance on the LABF and MEABF boards' decades-long application of those statutes, equity required a prospective-only application of the court's new and unanticipated interpretation of the Pension Code prohibiting the practice. Plaintiffs asked the court to declare the Funds' practice, combined with the participants' contributions to the Funds based on their union salaries (rather than the lower salary of their former public jobs), creates enforceable contractual rights that inform the interpretation and restrict the application of the "highest average annual salary" rules that are now being said to apply because of the amendments. Plaintiffs also asked the circuit court to declare that the LABF and MEABF were equitably estopped from applying the new interpretation based on the amendments to individuals who were members of the system before the Act. The circuit court granted summary judgment in favor of defendants on these supplemental counts XIII and XIV and denied plaintiffs' cross-motion for summary judgment, finding that the relief requested was barred by the court's earlier interpretation of the "highest average annual salary" rules, despite the Funds' 20-year practice to the contrary. The court also rejected plaintiffs' argument for prospective-only application. Plaintiffs appeal all of those rulings directly to this court, including the dismissal of their claims alleging that the change in the law denying a union salary in the calculation of "highest average annual salary" violated the pension clause of the Illinois Constitution.

¶ 18     With respect to plaintiffs' request for a declaration that section 8-226(c)(3) did not apply to defined contribution plans, in contrast to defined benefit plans, the circuit court rejected plaintiffs' argument and granted summary judgment for the Funds on this issue (counts X and XII of plaintiffs' complaint). Section 8-226(c)(3) provides that a participant may only earn union service credit in the MEABF if "the participant does not receive credit in any pension plan established by the local labor organization based on his employment by the organization." *Id.* Plaintiffs argued before the circuit court that in a defined benefit plan, such as the MEABF, a participant receives a fixed regular payment of a pension based on the participants' years of service credit and other factors such as salary and age. In a defined contribution plan, however, the participant is not guaranteed a fixed and regular pension payment based on years of service. Rather, the participant receives only the value of contributions and investment returns in his individual account. The circuit court rejected plaintiffs' argument, placing great weight on the modifier "any" and concluding that plaintiffs were "not seeking a mere liberal construction of an ambiguous provision, but the outright insertion of limiting terms to the otherwise clear and general phrase 'any pension plan.' "

¶ 19     The State appealed directly to this court pursuant to Illinois Supreme Court Rule 302(a) (eff. Oct. 4, 2011), seeking reversal of the circuit's order granting summary judgment for plaintiffs on counts IA, IIA, and IIIA, which found that the statutory amendments eliminating the right to earn union service credit for leaves of absence beginning after the effective date of the amendments violates the pension clause of the Illinois Constitution. Plaintiffs also sought

direct appeal in this court pursuant to Rule 302(b) (which we granted), seeking review of the circuit court's denial of their claims (1) challenging the amendment disallowing the use of union salary in the calculation of "highest average annual salary" and (2) seeking a declaration that the "any pension plan" language of section 8-226(c)(3) of the Pension Code does not include a defined contribution plan. We have consolidated the parties' appeals and will address the State's appeal first.

¶ 20                                              ANALYSIS

¶ 21    Summary judgment is warranted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2012). By filing cross-motions for summary judgment, the parties extend an invitation to the court to decide the questions presented as a matter of law. *Nationwide Financial, LP v. Pobuda*, 2014 IL 116717, ¶ 24. We review summary judgment rulings *de novo*. *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20.

¶ 22              I. Elimination of Union Service Credit for Leaves of Absence

¶ 23    Before this court, the State argues that the circuit court erred in finding that the future ability to earn service credit for private employment in a labor organization is protected by the pension clause of the Illinois Constitution. According to the State, the drafters of the constitution and the voters that ratified it could not have intended to offer constitutional protection to such a benefit where the benefit is not actually based on public service and does not encourage future public service.

¶ 24    We note that statutes are presumptively constitutional and the party challenging the validity of a statute bears the burden of rebutting this presumption by establishing a clear constitutional violation. *McElwain v. Office of the Illinois Secretary of State*, 2015 IL 117170, ¶ 14. We will uphold the constitutional validity of a statute whenever reasonably possible. *Id.* It is well established, however, that, where there is any question as to the legislative intent and clarity of the language of a pension statute, it must be liberally construed in favor of the rights of the pensioner. *Kanerva v. Weems*, 2014 IL 115811, ¶ 55. This rule applies "with equal force" to interpretations of the provisions of the pension protection clause of our state constitution. *Id.* Thus, to the extent that there may be any lingering doubt about the meaning or effect of the provisions at issue in this case, we must resolve that doubt in favor of the members of this State's public retirement system. *Id.*

¶ 25    Here, the circuit court held Public Act 97-651 unconstitutional to the extent that it took away a retirement benefit that the legislature had previously granted—the right to claim union service credit—in violation of the pension protection clause. Article XIII, section 5, of the Illinois Constitution sets forth the pension clause as follows:

> "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5.

Under this language, if something qualifies as a benefit of the enforceable contractual relationship resulting from membership in one of the pension or retirement systems of any unit of local government or school district of the State, " 'it cannot be diminished or impaired.' "

*In re Pension Reform Litigation*, 2015 IL 118585, ¶ 45 (*Heaton*) (quoting *Kanerva*, 2014 IL 115811, ¶ 38). This includes all pension benefits that flow directly from membership. *Kanerva*, 2014 IL 115811, ¶ 40. The benefits protected by the pension protection clause include those benefits attendant to membership in the State's retirement system, such as subsidized health care, disability and life insurance coverage, and eligibility to receive a retirement annuity and survivor benefits (see *Jones v. Municipal Employees' Annuity & Benefit Fund*, 2016 IL 119618, ¶ 36; *Kanerva*, 2014 IL 115811, ¶¶ 39, 41), along with the right to purchase optional service credit in the state pension system for past military service (see *Buddell v. Board of Trustees*, 118 Ill. 2d 99, 105-06 (1987)).

¶ 26    The protections afforded by our constitution to such benefits attach once an individual begins employment in a position covered by a public retirement system, not when the employee ultimately retires. *Heaton*, 2015 IL 118585, ¶ 46. Therefore, once a person commences to work and becomes a member of a public retirement system, any subsequent changes to the Pension Code that would diminish the benefits conferred by membership in the retirement system cannot be applied to that person. *Id. Heaton* further emphasized that

> "[a]dditional benefits may always be added, of course [citation], and the State may require additional employee contributions or other consideration in exchange [citation]. However, once the additional benefits are in place and the employee continues to work, remains a member of a covered retirement system, and complies with any qualifications imposed when the additional benefits were first offered, the additional benefits cannot be unilaterally diminished or eliminated." *Id.* ¶ 46 n.12.

¶ 27    It is undisputed that, when plaintiffs began their employment and became members of the public pension system, they had the statutory right to count time spent on leave of absence with their local labor organization in their annuity calculations. The benefit plaintiffs seek to enforce is their right that existed in the Pension Code before the amendments of Public Act 97-651 to purchase, if they so choose, service credit during a leave of absence in the future to work for a local union. If that benefit is part of the contractual relationship resulting from membership in the public retirement system, it is protected by the pension clause even if the participant had not yet exercised the option before the amendments of the Act took effect. See *Buddell*, 118 Ill. 2d at 105-06 (under the pension clause, a statute creating a new deadline for purchasing military service credit could not be applied to a current participant who had not yet exercised the option to purchase service credit by the time of the amendment).

¶ 28    The only real question presented by the State's appeal, then, is whether the right to earn service credit on a leave of absence from a public employer to work for a local labor organization is a "benefit" within the meaning of the pension clause. The State concedes that a statutory right to union service credit was created but argues that the right is not one entitled to constitutional protection because the framers of the constitution did not intend it to be entitled to such protection. In so arguing, the State merely relies upon the general justification for a public pension system, which is to reward past public service, to provide a form of compensation for past public service, and to encourage continued public service.

¶ 29    We find nothing in the case law, in the text of the pension clause, or in the constitutional debates on the clause that would support the State's argument that the particular benefit conferred here is not entitled to protection. *Kanerva* held that the text of the pension clause places no limits on the kind of "benefit" that is protected by the clause so long as the benefit is

part of the contractual relationship "derived from membership" in the retirement system. *Kanerva*, 2014 IL 115811, ¶¶ 41, 54. The participants at issue here are members of their retirement systems entirely due to their government employment. Each plaintiff was either working in his public job when the option to earn union service credit was added as a benefit or started public employment and joined the retirement system after the benefit was already in place. The benefit was clearly a "benefit" within the meaning of the pension clause, and the State's argument must therefore be rejected.

¶ 30    The State's contention that the delegates and voters did not intend that the benefit at issue would be protected by the pension clause is pure speculation and appears to be manifestly inaccurate, as the right to earn service credit on a leave of absence working for a teacher labor organization was one of the retirement system benefits in the Pension Code for many years prior to and at the time the Illinois Constitution was debated by the drafters and then ratified by the voters (see Ill. Rev. Stat. 1969, ch. 108½, ¶ 17-134), just like the right to purchase the past military service credit involved in *Buddell*. Thus, it was the public policy of the State at the time our constitution was adopted to grant a path to such service credit as a benefit of participation in at least one of the public retirement systems. Similar to a legislature that is presumed to act with knowledge of all prior legislation, the drafters of the constitution are presumed to have acted with full knowledge of existing statutory law and the public policy of this state. *Kanerva*, 2014 IL 115811, ¶ 41. If the drafters had intended to prevent any benefit related to service credit in connection with work done for a labor organization while on a leave of absence, they could have so specified, especially where union service credit was already part of the existing pension statute to some extent. But they did not. Rather, the drafters chose "expansive language" that broadly defines the range of benefits encompassed.

¶ 31    Plaintiffs have offered a public policy rationale for the union-service benefit, arguing that it encourages public employees who do go to work for their unions to take a leave of absence rather than quitting their public jobs altogether, thereby increasing the likelihood that they might return to their public employment. Plaintiffs also maintain that the benefit furthers the State's labor relations policies by promoting experienced public employees familiar with public service contracts and priorities to serve as management counterparts in collective bargaining. The State, on the other hand, argues that the benefit in question actually encourages public servants to discontinue active government employment.

¶ 32    We find that, regardless of the purpose of the benefit and the merits of the suggested utility of the benefit, it was a matter for the legislature to decide. And, as *Kanerva* noted, "[w]e may not rewrite the pension protection clause to include restrictions and limitations that the drafters did not express and the citizens of Illinois did not approve." *Id.* Accordingly, we hold that the circuit court correctly determined that Public Act 97-651 was unconstitutional to the extent that it eliminated as a pension benefit for current participants the ability to earn union service credit previously bestowed by the legislature.

¶ 33                              II. Calculation of "Highest Average Annual Salary"

¶ 34    We turn now to plaintiffs' appeal and first address the issue of whether the amendments of Public Act 97-651 purporting to "clarify" that only public salaries may be used in calculating the "highest annual average salary" violate the pension clause of our constitution. Plaintiff's argument requires this court to construe a number of provisions of the Pension Code.

¶ 35    We note at the outset that the primary goal in construing a statute is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the language of the statute itself. *Slepicka v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 14. But a court will not read language in isolation; it will consider it in the context of the entire statute. *Id.* It is also proper to consider not only the language of the statute but the reason for the law, the problem sought to be remedied, the goals to be achieved, and the consequences of construing the statute one way or another. *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 15. Additionally, we must presume that the legislature did not intend to produce absurd, inconvenient, or unjust results. *Board of Education of Springfield School District No. 186 v. Attorney General*, 2017 IL 120343, ¶ 25.

¶ 36    A statute is ambiguous if it can fairly be understood by reasonably well-informed persons in two or more different ways. *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 46 (2002). Furthermore, whenever there is any question as to the legislative intent and clarity of the language of a pension statute, it must be liberally construed in favor of the rights of the pensioners. *Kanerva*, 2014 IL 115811, ¶ 36.

¶ 37    Before Public Act 97-651 was enacted, both the LABF and the MEABF calculated pensions based on the participants' "highest average annual salary for any 4 consecutive years in the last 10 years of service." 40 ILCS 5/8-138(g-1), 11-134(f-1) (West 2010); see also *id.* §§ 8-138(b), 11-134(a). As was the case with some of the individual plaintiffs in this lawsuit, when a member took a leave of absence to work for a local union and contributed to the Funds for union service credit, they may have done so for years and ultimately retired while still on a leave of absence. In such cases where the salaries earned by the member from the union job were among his highest 4 consecutive years in the last 10 years of service, the LABF and MEABF used those salaries to calculate the "highest average annual salary." This was consistent with the provision enacted in 1991, requiring that the contributions by the participant for union service credit while on leave of absence be "based on his current salary with such labor organization." *Id.* §§ 8-226(c), 11-215(c)(3). Thus, according to the LABF's and the MEABF's interpretations, the salary base for contribution purposes and for pension-calculation purposes was the same.

¶ 38    Public Act 97-651 eliminated this possibility of using a salary paid to the member while on leave of absence to work for a union in calculating the "highest average annual salary" for pension purposes. In that regard, the Act added a new subsection (e) to both section 8-233 and section 11-217. These subsections now provide as follows:

> "This Article shall not be construed to authorize a salary paid by an entity other than an employer, as defined in [section 8-110 or section 11-107], to be used to calculate the highest average annual salary of a participant. This subsection (e) is a declaration of existing law and shall not be construed as a new enactment." 40 ILCS 5/8-233(e), 11-217(e) (West 2012).

"Employer," as defined in sections 8-110 and 11-107 and referred to in subsection (e) quoted above, is limited to large cities and certain public entities and boards and does not include local labor organizations. See *id.* §§ 8-110, 11-107.

¶ 39    Public Act 97-651 also amended section 8-138(g-1) by clarifying the meaning of highest average annual salary as shown in part in the italicized portion as follows:

- 10 -

"For purpose of calculating this annuity, 'final average salary' means the highest average annual salary for any 4 consecutive years in the last 10 years of service. *Nothwithstanding* [*sic*] *any provision of this subsection to the contrary, the 'final average salary' for a participant that received credit under subsection (c) of Section 8-226 means the highest average salary for any 4 consecutive years (or any 8 consecutive years if the employee first became a participant on or after January 1, 2011) in the 10 years immediately prior to the leave of absence, and adding to that highest average salary, the product of (i) that highest average salary, (ii) the average percentage increase in the Consumer Price Index during each 12-month calendar year for the calendar years during the participant's leave of absence, and (iii) the length of the leave of absence in years, provided that this shall not exceed the participant's salary at the local labor organization. For purposes of this Section, the Consumer Price Index is the Consumer Price Index for All Urban Consumers for all items published by the United States Department of Labor.*" Pub. Act 97-651 (eff. Jan. 5, 2012) (amending 40 ILCS 5/8-138(g-1)).

The legislature made a similar amendment to the LABF article. See 40 ILCS 5/11-134(f-1) (West 2012).

¶ 40    Plaintiffs argue that the above-quoted amendments changed the law by eliminating the possibility of using salary paid to a member by a union to calculate highest average annual salary. Plaintiffs maintain that the changes diminished their preexisting retirement system benefits by limiting the salary base for their pensions. They contend that the text of articles 8 and 11 of the Pension Code before the amendments permitted a union salary to be used in the highest average salary calculation and that, even if the Pension Code was ambiguous in this respect before Public Act 97-651, the legislature could not simply declare their amendments to be a "declaration of existing law" in order to clear up the ambiguity and circumvent the protection of the pension clause.

¶ 41    In response, the State argues that the amendments of Public Act 97-651 did not change the meaning of the Pension Code because it always unambiguously required that the salary to be used for calculating the pension was to be the salary attached to the government position in which the employee actually worked or from which he was on leave of absence. To support its argument, the State relies upon a link between the definitions of "salary," "present employee," and "employer" under the Pension Code. The State first notes the definition of "salary" in section 8-117 of the Pension Code, which states in relevant part:

" 'Salary': Annual salary of an *employee* as follows:
        ***

    (b) If appropriated, fixed or arranged on an annual basis, beginning July, 1957, the actual sum payable during the year if the employee worked the full normal working time in his position, at the rate of compensation, exclusive of overtime and final vacation, appropriated or fixed as salary or wages for service in the position.

    (c) If appropriated, fixed or arranged on other than an annual basis, beginning July 1, 1957, the applicable schedules specified in Sections 8-233 and 8-235 shall be used for conversion of the salary to an annual basis." (Emphasis added.) 40 ILCS 5/8-117 (West 2010).

The State further notes that the Pension Code at all times defined "present employee" as "[a]ny employee of an employer" (*id.* § 8-114(a)) and the word "employer" has always referred to certain government entities, such as the City or the Chicago Board of Education. As did the circuit court, the State also believes the statutory references to "appropriated" reinforce the notion that the salary for purposes of the calculation was meant to be the one set by the public employer.

¶ 42 We find the Pension Code prior to the amendments to be ambiguous on the question of whether the union salary while on leave of absence could be used as a basis for calculating the pension and find the State's argument to the contrary to be unpersuasive. The State places great weight on the definitions of "salary," "employee," and "employer" found in the Pension Code. But it must be kept in mind that the Pension Code specifically provided that the salary base for pension purposes was the "highest average annual salary for any consecutive 4 years *in the last 10 years of service*." (Emphasis added.) *Id.* § 8-138(g-1). Work done on a union leave of absence is indisputably a "period of service." Nothing in the statute before the amendment specifically stated that a union salary paid to an employee during his last 10 years of service could not be used in the calculation. We do not deduce a legislative intent with the definition of "salary" in the Pension Code to define a limited class of payers of a salary. Rather, the purpose of the definition seems to be to provide directions about such matters as whether overtime could be included in annual salary and how to convert an hourly wage to an annual salary.

¶ 43 The Pension Code's definitions of "employee" and "employer" do not clear up the ambiguity. All the parties to this lawsuit concede that an employee on leave of absence from his public job retains his status at all times as an employee of his public employer and continues to be a "participant" for pension purposes. 40 ILCS 5/8-113(a) (West 2012). The question that was left unanswered was whether the union salary could be used in the calculation.

¶ 44 We also do not find controlling the legislature's use of the term "appropriated." While that term does suggest a governmental appropriation, the statute also uses the terms "fixed or arranged," which are placed in the disjunctive in section 8-117(b) and could be read consistently with the setting of a salary by a private employer. At any rate, we note that the meaning ascribed to a term defined in the Pension Code, such as "salary," can differ when "the context otherwise requires." *Id.* §§ 8-102, 11-217(b). Here, the context requires otherwise. The legislative intent of the above-noted definitions to set rules for calculating the amount of a salary rather than to limit the class of payers of a salary is evident in that these provisions have not been materially changed since the Pension Code was adopted in 1963. It was not until 1987 that the legislature adopted union service credit in the LABF and MEABF. In 1963, there was no service credit for any period of union service. The only salaries the employees would have been earning or upon which they would have been contributing to the pension fund were government salaries. Four years after the 1987 amendment allowing union service credit, the legislature made another amendment, this time to provide that an employee's union service credit contributions had to be "based on his current salary with such labor organization." 40 ILCS 5/8-226(c)(1), (2), 11-215(c)(3)(A), (B) (West 2010). It seems more likely than not that the legislature intended the salary base for contribution purposes to be the same as for pension calculation purposes following the 1987 and 1991 amendments, but as noted above, we find the statute to be ambiguous on whether the legislature intended the union salary to be used in the calculation. It seems that if it had intended to exclude the union salary from the calculation

- 12 -

of the pension base but not for contribution purposes, it would have clearly stated so at the time of the 1987 or 1991 amendments.

¶ 45    Moreover, it would arguably create an absurd result to interpret the statutory scheme as it existed prior to Public Act 97-651 to exclude the union salary from the calculation of the "highest average annual salary for any 4 consecutive years in the last 10 years of service." *Id.* §§ 8-138(g-1), 11-134(f-1); see also *id.* §§ 8-138(b), 11-134(a). If before the Act the highest average annual salary could not be calculated using the union salary the participant was actually earning during his leave of absence, a conflict with sections 8-138 and 11-134 would arise whenever a member retires while on a leave of absence lasting more than six years. In such cases, members would not have 4 years of (or any) salaries paid by the public entity in the last 10 years of service from which to calculate a pension. For some members, such as two of the plaintiffs in this case, limiting the "salary" for the highest annual salary calculation to a public salary would result in the absurd result of their having no eligible salaries for calculating their pensions. In construing a statute, we must presume that the legislature did not intend an absurd result. See *People v. Fort*, 2017 IL 118966, ¶ 35.

¶ 46    Given the arguably absurd and unjust result of having no eligible salaries for calculating the pension, Public Act 97-651 amended sections 8-138(g-1) and 11-134(f-1) to create a new method for calculating the highest average annual salary only applicable to participants with union service credit. Instead of using salaries from within the last 10 years of service as with every other LABF and MEABF member, the statute postamendment now requires that the highest annual average salary be based on salaries before the leave of absence, no matter how long ago. The amendments then ameliorate the harshness of not including the union salary in the calculation by now including an inflation adjustment.

¶ 47    In response to the argument that, under the pre-Public Act 97-651 version of the law, there might be no salaries to calculate the highest average annual salary if the union salary could not be used, the State contends that a hypothetical salary should be used to make the calculation based on what the employee would have earned had he continued in his public job. The State points to the relevant definition of "salary" referring to "the actual sum payable during the year if the employee worked the full normal working time in his position, at the rate of compensation, exclusive of overtime and final vacation, appropriated or fixed as salary or wages for service in the position." 40 ILCS 5/8-117(b), 11-116(a) (West 2010). The State maintains that, based on this language, the pensionable salary does not have to be tied to an amount actually *received* or *paid* by the public employer.

¶ 48    Again, we find this language to be ambiguous. The "position" referred to in the portion of the statute noted by the State could just as well refer to a participant's position with the union. And again, it also appears that with the use of the word "if" and the phrase "normal working time in his position," the legislature was concerned with giving directions for assessing the *amount* of the salary rather than who could be a *payer* of a salary.

¶ 49    The State argues that, even if the statutory scheme with respect to whether a union salary can be considered in the calculation is ambiguous, the legislature properly clarified that it was always intended to mean the salary for the employee's position with the public employer. In support of its stance, the State cites general case law for the proposition that an amendment may be applied retroactively if its purpose is to clarify an existing law that is ambiguous.

- 13 -

¶ 50    There are a number of reasons why the State's argument is faulty and cannot be applied to the circumstances here. First, the legislative intent that controls the construction of a public act is the intent of the legislature that passed that act, not the intent of the legislature that amends the act many years later. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 441-42 (2008). Here, we have already determined that the language is ambiguous and the legislative intent unclear. Second, because it was a pension statute that was found to be ambiguous, the rule applies that, where there is any question as to legislative intent and the clarity of the language, "it must be liberally construed in favor of the rights of the pensioner." *Kanerva*, 2014 IL 115811, ¶ 55. If the legislature had the power to "clarify" the intent of an ambiguous pension statute *against* the rights of the participants, it would essentially negate the protections of the pension clause and override the proviso from *Kanerva* about the court's duty to liberally construe pension statutes in favor of the rights of the pensioners.

¶ 51    For the reasons noted, we hold that the ambiguous statutory framework prior to the amendment of Public Act 97-651 must be construed as allowing the right to use a union salary from a leave of absence under section 8-226(c) or 11-215(c)(3) to calculate the highest average annual salary. The amendments effected by Public Act 97-651 necessarily changed the law and thereby diminished plaintiffs' retirement system benefits in violation of the pension protection clause of the Illinois Constitution. The circuit court therefore erred in granting the State's motion to dismiss the counts of plaintiffs' complaint that raised this issue.

¶ 52                          III. Whether "Any Pension Plan" Includes
                                a Defined Contribution Plan

¶ 53    Plaintiffs next raise an issue of statutory construction unrelated to the two constitutional issues resolved above. They argue that the circuit court erred in denying their motion for summary judgment with respect to counts X and XII of their complaint, which sought a declaration that the "any pension plan" language of section 8-226(c)(3) of the Pension Code does not apply to defined contribution plans. In that regard, section 8-226(c)(3) provides that an MEABF member may receive service credit for time spent on a leave of absence working for a local labor organization, provided "the participant does not receive credit in any pension plan established by the local labor organization based on his employment by the organization." 40 ILCS 5/8-226(c)(3) (West 2012). Plaintiffs concede that the phrase "receive credit in any pension plan" clearly applies to a defined *benefit* plan established by a local labor organization, but they contend that the phrase was not intended to include a defined *contribution* plan, such as a 401(k) plan (26 U.S.C. § 401(k) (2012)). The difference between the two kinds of plans is significant. Defined benefit plans, such as the MEABF, provide a fixed, regular payment upon retirement determined by a formula giving the participant credit for years of service and other factors such as age and salary. See 40 ILCS 5/8-138, 8-226 (West 2012); *Jones*, 2016 IL 119618, ¶ 4 ("[T]he City pension funds provide traditional defined benefit plans under which members receive specified annuities upon retirement generally based upon the member's salary, years of service, and age at retirement."); see also *In re Marriage of Blackston*, 258 Ill. App. 3d 401, 402 (1994). By contrast, in a defined contribution plan the participant is not entitled to any guaranteed, fixed, and regular payments upon retirement. Instead the participant is entitled only to the accumulated value of contributions at the time of any withdrawal. 40 ILCS 5/8-138, 8-226 (West 2012). The way section 8-226(c)(3) is interpreted will have a

significant impact for a few of the plaintiffs in this case who are in jeopardy of losing significant amounts of service credit in the Funds for having contributed to a defined contribution plan through their union job while on a leave of absence from their government employment.

¶ 54    Plaintiffs note that section 8-226(c)(3)'s prohibition only applies if the participant "receives credit" in a pension plan. Plaintiffs claim that the statute is referring to receiving *service* credit based on a period of employment. They maintain that this phraseology supports their construction because only in a defined benefit plan does a participant receive credit for years of service toward a pension. *Bandak v. Eli Lily & Co. Retirement Plan*, 587 F.3d 798, 801 (7th Cir. 2009). Plaintiffs further argue that the purpose of the statute is fulfilled by barring receipt of service credit in a defined benefit plan but that purpose does not require barring members from accumulating retirement savings in some other way, such as a 401(k).

¶ 55    The Funds as defendants argue, on the other hand, that the term "any pension plan" is clear and unambiguous. They point out the expansive nature of the modifier "any" and rely on the circuit court's conclusion that "pensions come in all shapes and sizes, ranging from defined benefit to defined contribution to hybrid plans in between." Defendants also disagree with plaintiffs' contention that the phrase "receives credit" means credit for years of service based on employment. According to defendants, "credit" simply means "the balance in an account," and thus the word is consistent with a defined contribution plan.

¶ 56    Whether section 8-226(c)(3) applies to defined contribution plans in addition to defined benefit plans is a question of statutory interpretation. We again note that our primary objective in construing a statute is to determine the intent of the legislature, and the most reliable indicator of that intent is the plain and ordinary meaning of the statute itself. The Pension Code does not define the phrase "pension plan." When a statute fails to define a term, it is entirely appropriate to look to the dictionary to ascertain the meaning of the term. *People v. Chapman*, 2012 IL 111896, ¶ 24.

¶ 57    Black's Law Dictionary defined "pension" (at the relevant time when the statutory section at issue was enacted in 1987) as a "[r]etirement benefit paid regularly (normally, monthly), with the amount of such based generally on length of employment and amount of wages or salary of pensioner." Black's Law Dictionary 1021 (5th ed. 1979). It also defined "pension plan" in relevant part as "[a] plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees, or their beneficiaries, over a period of years (usually for life) after retirement. Retirement benefits are measured by, and based on, such factors as years of service and compensation received by the employees." *Id.*

¶ 58    Plaintiffs argue that these dictionary definitions are consistent with what a participant in the Funds would commonly understand a "pension plan" to be. A person with only a 401(k) defined contribution plan, for example, would not likely think of himself as having a "pension," given that the amount to be received upon retirement is not guaranteed and not "definitely determinable." Nor is it based on any factors such as years of service or salary. Instead, he would be much more likely to think of himself as having a retirement savings plan. Only someone in a defined benefit plan would be likely to think of himself as having a pension.

¶ 59    The defendant Funds also cite dictionary definitions for "pension" dating to the time period when the statute was enacted. But those definitions actually support plaintiffs' argument that

the legislature may have intended only defined benefit plans, not defined contribution plans, when it used the phrase "any pension plan." For example, the Funds cite Webster's New World Dictionary: Second Concise Edition (1982), which defines "pension" as "a regular payment, not wages, to one who has fulfilled certain requirements, as of service, age, disability, etc." Similarly, the Funds rely on an online version of a Merriam-Webster dictionary that defines "pension" as "a fixed sum paid regularly to a person." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/pension (last visited Nov. 8, 2018) [https://perma.cc/LPG8-9Z6F]. But these definitions speak of a "fixed sum," "paid regularly," based on such factors as "service" and "age," and would thus be consistent with a traditional defined benefit plan but not a defined contribution plan. A defined contribution plan guarantees only the value of the contributions to the plan that survive the variables of market performance, and there is no fixed, determinable, guaranteed amount based on service and age. See *In re Marriage of Blackston*, 258 Ill. App. 3d at 402.

¶ 60    The only definition that solidly supports the Funds' broad definition is found in the federal Employee Retirement Income Security Act of 1974 (ERISA), which defines a "pension plan" as follows:

> "any plan, fund, or program, which was heretofore or is hereafter established or maintained by an employer or by an employee organization \*\*\*
>
> > (i) [that] provides retirement income to employees, *or*
> >
> > (ii) *results in a deferral of income by employees* for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." (Emphases added.) 29 U.S.C. § 1002(2)(A) (2012).

The Funds note that, because this definition of "pension plan" is so broad, "virtually any contract that provides for some type of deferred compensation will also establish a de facto pension plan" under ERISA. *Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374, 1377 (9th Cir. 1994). The Funds argue that "it is a stretch" to think that the Illinois General Assembly was not aware of this ERISA definition when it enacted the language of section 8-226(c)(3) of the Pension Code in 1987 because the ERISA definition of "pension plan" was firmly in place by then.

¶ 61    We note that the existence of alternate dictionary definitions of a word or phrase, each making some sense under the statute, leads to the conclusion that the term in question is ambiguous. *Poris v. Lake Holiday Property Owners Ass'n*, 2013 IL 113907, ¶ 50. Here, the broad definition of "pension" found in ERISA contrasts with the more common understanding of "pension" found in the dictionary definitions quoted above. The ERISA definition alone is obviously not controlling of the outcome here where the Pension Code makes no reference to it. Moreover, the purpose of the ERISA definition of "pension plan" seems to be to have a wide sweep to protect the expected benefits of plan participants (see *Sly v. P.R. Mallory & Co.*, 712 F.2d 1209, 1211 (7th Cir. 1983)), while the purpose of section 8-226(c)(3) is to prohibit a member from receiving credit toward a pension for the same period of time he is receiving credit in a pension of a local labor organization. But absent from section 8-226(c)(3) is any obvious intent to prohibit an employee from accumulating retirement savings in some other way, such as a defined contribution plan account. Assuming that it would be a worthy public

policy benefit at all to allow a union leave of absence like the ones involved in this case, it would seem that deterring such forms of retirement savings, especially where they might not involve any employer contributions at all, would be an unlikely public policy.

¶ 62      The Funds focus on the word *any* in the "any pension plan" language of the statute. But if a defined benefit plan is a pension plan and a defined contribution plan is not a pension plan under the commonly understood meaning of "pension plan" in 1987 when the provision was enacted, then defendants' argument must be rejected. At any rate, to the extent that there are competing definitions of "pension" or "pension plan," some that would and some that would not include defined contribution plans, it means only that the term as used in section 8-226(c)(3) "does not have a single plain meaning but is ambiguous." See *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 11 (2009).

¶ 63      Because the term "pension plan" in section 8-226(c)(3) is ambiguous in this respect, it must be liberally construed in favor of the rights of the pensioners so as to apply to a defined benefit plan only and not to defined contribution plans. See *Kanerva*, 2014 IL 115811, ¶ 55. Accordingly, we reverse the circuit court and hold that the term "receive credit in any pension plan" as used in section 8-226(c)(3) does not include defined contribution plans.

¶ 64                                          CONCLUSION

¶ 65      Our resolution of the foregoing issues renders it unnecessary to address the alternative arguments raised by the parties in their briefs. For the foregoing reasons, we affirm the circuit court's judgment granting plaintiffs' motion for summary judgment and denying defendants' cross motions for summary judgment on the counts of plaintiffs' complaint raising a pension-clause challenge to the elimination of the right to earn service credit for a union leave of absence. We find that the circuit court properly held that, with respect to participants who were already members on the effective date of Public Act 97-651, the denial of the future ability to earn service credit on leave of absence for labor organization employment violated the pension clause of the Illinois Constitution. We reverse the circuit court's judgment dismissing the portions of plaintiffs' complaint that alleged a violation of the pension clause of the Illinois Constitution related to Public Act 97-651's change in the law to deny the use of a union salary under section 8-226(c) or 11-215(c)(3) to calculate the "highest average annual salary." We also reverse the circuit court's rulings on the parties' cross-motions for summary judgment that resulted from the circuit court's construction of section 8-226(c)(3) to include defined contribution plans within the definition of "any pension plan." We remand the cause to the circuit court of Cook County for further proceedings consistent with this opinion.[3]

---

[3]Our holding striking down the specific provisions of Public Act 97-651 mentioned in this case of course applies only to the specific provisions discussed herein. The rest of the provisions of Public Act 97-651 are subject to principles of severability, as section 1-105 of the Pension Code specifically provides that "[t]he invalidity of any provision of this Code shall not affect the validity of the remainder of this Code." 40 ILCS 5/1-105 (West 2012). Similarly, section 98 of Public Act 97-651 provides that "[t]he provisions of this Act are severable under Section 1.31 of the Statute on Statutes." Pub. Act 97-651, § 98 (eff. Jan. 5, 2012). We therefore make no ruling here on other provisions of Public Act 97-651, amending the Pension Code, that are not before us.

¶ 66        Circuit court judgments affirmed in part and reversed in part.

¶ 67        Cause remanded.